435 So.2d 580 (1983)
J.R. HAGBERG d/b/a Jim Jackson Contractor, Plaintiff-Appellee,
v.
JOHN BAILEY CONTRACTOR and R.L. Abshire Construction, Inc., A Joint Venture, and Trinity Universal Insurance Company, Defendants-Appellants.
No. 82-753.
Court of Appeal of Louisiana, Third Circuit.
June 29, 1983.
Rehearings Denied August 17, 1983.
*582 Camp, Carmouche, Van M. Davidson, Jr., Lake Charles, for defendants-appellants.
Gold, Little, Simon, Weems & Bruser, Robert G. Nida, Alexandria, for plaintiff-appellee.
Before GUIDRY, STOKER and KNOLL, JJ.
KNOLL, Judge.
J.R. Hagberg doing business as Jim Jackson Contractor (hereafter Hagberg) sued John Bailey Contractor and R.L. Abshire Construction, Inc., joint venturers (hereafter Bailey), together with Bailey's surety, Trinity Universal Insurance Company. Hagberg's basis for recovery of $95,704.49 is an oral contract with Bailey to rejuvenate approximately eleven miles of roadway in Lake Arthur, Louisiana.
In 1980 the Town of Lake Arthur, Louisiana advertised for bids for the rejuvenation and resurfacing of certain municipal streets (hereafter Lake Arthur Project). The Lake Arthur Project was comprised of two distinct, but interrelated activities. Hagberg's task was to scarify the existing road, to heat the dislodged surface, and to apply a liquid bonding agent. Bailey was to immediately follow this treatment with a "lay-down" machine which would apply a thin, evenly distributed layer of asphalt. "Rollers" would then compact the entire surface and complete the bond with the old road.
During the Fall of 1980, J.R. Hagberg as superintendent of James A. Jackson d/b/a Jim Jackson Contractor negotiated an oral contract between Bailey and Jackson for heater-scarifying work to be performed in connection with the paving and rejuvenation of the Lake Arthur streets. At that time James A. Jackson d/b/a Jim Jackson Contractor (hereafter Jackson) held a valid Louisiana contractor's license for the work to be undertaken.
The contract between Bailey and Jackson called for the payment to Jackson of 76¢ per square yard of heater-scarifying and $1.50 for each gallon of rejuvenating agent used in the process. Bailey utilized those figures to submit a bid to the Town of Lake Arthur of 88¢ per square yard unit price for the heater-scarifying and $1.50 for each gallon of rejuvenating agent used.
Three contractors submitted bids of little variance on the Lake Arthur Project. From that group of bids the Town of Lake Arthur selected Bailey's proposal.
In 1980 Jackson began to suffer financial setbacks which resulted in his bankruptcy by the end of the year. On December 1, 1980, James A. Jackson, through the bankruptcy court, sold and assigned to J.R. Hagberg the assets of Jim Jackson Contractor, including the contract to perform the Lake Arthur Project. After the consummation of this transaction James Jackson remained as a consultant to Hagberg.
James A. Jackson and J.R. Hagberg developed the process of heater-scarification and rejuvenation together with the specialized equipment needed to do this work. Even though this technique of road improvement had been used successfully in other states, at the time of this lawsuit, it had only been used in two locations within Louisiana, those being at Jennings and Lake Arthur. These construction operations were performed under the supervision of J.R. Hagberg.
Hagberg commenced work on the Lake Arthur Project on December 15, 1980, and completed the heater-scarifying work on February 12, 1981. On the basis of the amount of work done and the respective unit prices, Hagberg charged Bailey $95,704.49. Bailey has not paid any of Hagberg's invoices.
On March 11, 1981, Hagberg filed a notice of claim under the Public Works Act. Pursuant to R.S. 9:4941 Bailey filed a surety bond with the Recorder of Mortgages for Jeff Davis Parish on May 6, 1981, so that it could receive payment from the Town of Lake Arthur. A notice of acceptance of the Lake Arthur Project was filed on June 7, 1982.
Hagberg filed suit on July 6, 1981, against Bailey and its surety. On August *583 31, 1981, the defendants filed their answer and reconvened for payment of $143,550 allegedly occasioned by Hagberg's failure to perform the Lake Arthur Project in a workmanlike manner. On March 10, 1982, the defendants filed a peremptory exception to the lawsuit alleging that Hagberg did not possess a valid Louisiana contractor's license during the time he performed the subcontract work on the Lake Arthur Project.
After trial on the merits, the district court rendered judgment in favor of Hagberg and against John Bailey Contractor, R.L. Abshire Construction, Inc., and their surety, Trinity Universal Insurance Company, jointly and in solido, in the sum of $95,704.49 together with attorney fees in the amount of $8,613.40. The judgment further granted Hagberg legal interest on 90% of the principal amount of the judgment from March 11, 1981, and interest on the remaining 10% from July 22, 1982. Bailey's reconventional demand was rejected.
In its suspensive appeal Bailey contends that the trial court erred when it found that: (1) Hagberg was entitled to recover $95,704.49 claimed against Bailey even though Hagberg violated a prohibitory law by engaging in the business of contracting in Louisiana without a contractor's license contrary to R.S. 37:2150, et seq.; (2) Bailey failed to establish by the preponderance of the evidence that Hagberg promised or committed himself to a production rate in excess of that which was actually delivered; (3) Bailey failed to prove by the preponderance of the evidence that Hagberg negligently failed to perform work in a workmanlike manner which damaged and delayed Bailey; and, (4) Bailey was not entitled to damages from Hagberg by reason of Hagberg's negligent failure to perform work in a workmanlike manner.
Hagberg has answered the appeal asking for an increase in the attorney fee award and seeking legal interest on the entire principal amount of the judgment from March 11, 1981.
We will treat specification of error one and Hagberg's answer to the appeal individually; specifications of error two, three, and four will be consolidated for discussion.

APPLICATION OF R.S. 37:2157(A)
Under the licensing provisions LSA-R.S. 37:2157(A) defines a contractor as:
"... any person, firm, partnership, co-partnership, association, corporation, or other organization, or any combination thereof, who undertakes, attempts, or submits a bid or offer to construct, supervise, superintend, oversee, direct or in any manner assume charge of the construction, alteration, repair, improvement, movement, demolition, putting up, tearing down, or furnishing labor, material, or equipment and installing same for any building, highway, road, railroad, sewer, grating, excavation, pipeline, public utility structure project, development, housing, or housing development, improvements, or any other construction undertaking for which the cost of same is fifty thousand or more."
For the purpose of this statute a contractor must not only furnish labor, material or equipment, but he must also oversee its installation in the project. Messina v. Koch Industries, Inc., 283 So.2d 204 (La.1973). Messina, supra, states: "The conjunctive `and' requires the supplier-potential contractor to be in charge of both furnishing and installing."
In addition to furnishing specialized equipment and 3871.7 gallons of rejuvenating agent, Hagberg provided labor and supervisory personnel for the heater-scarifying portion of the Lake Arthur Project.
Hagberg's oral agreement which was negotiated prior to the submission of Bailey's bid included a contract price of $95,704.68 to cover Hagberg's heater-scarifying work on the Lake Arthur Project. Plaintiff's invoices dated January 26, and March 3, 1981, reflect charges to Bailey for the full amount of their contract.
In light of the foregoing analysis we must conclude that Hagberg was a contractor within the purview of R.S. 37:2157(A).

*584 CLASSIFICATION OF R.S. 37:2150 ET SEQ.
Only a person who has obtained a contractor's license from the State Licensing Board for Contractors may be engaged in the contracting vocation in the State of Louisiana.[1] LSA-R.S. 37:2160. The penalty for violators is provided at R.S. 37:2160(C) which states:
"Anyone violating this section of this chapter shall be guilty of a misdemeanor and, upon conviction, shall be fined a sum not to exceed five hundred dollars per day of violation, or three months in prison, or both...."
For the following reasons we conclude that individuals may not by private agreement set aside the contractor's licensing rules as established by the legislature.
R.S. 37:2160(A) provides:
"It shall be unlawful for any person to engage or continue in this state in business of contracting as defined in this chapter, without having qualified as a contractor under the provisions of this chapter."
Although § 2157(A)(2), (B), (C), and (D) carve out specific exceptions to the chapter definition of "contractor", § 2160 does not exempt those contractors to whom the provisions of the chapter do apply. The imperative "shall" is employed. Individuals who fall under the applicable statutory definition of "contractor" are not permitted to negate the command enunciated in § 2160.
The interests protected in the statute are delineated in R.S. 37:2150 which provides:
"The purpose of the legislature in enacting this Chapter [Chapter 24 contractors] is the protection of the health, safety and general welfare of all those persons dealing with persons engaged in the contracting vocation, and the affording of such persons of an effective and practical protection against the incompetent, inexperienced, unlawful and fraudulent acts of contractors with whom they contract."
This legislative statement clearly establishes an umbrella of protection for the general public.
As a prohibitory law the licensing provisions required for contractors cannot be avoided by private agreement.
LSA-C.C. Article 11 states:
"Individuals cannot by their conventions, derogate from the force of laws, made for the preservation of public order or good morals.
But in all cases in which it is not expressly or impliedly prohibited, they can renounce what the law has established in their favor, where the renunciation does not affect the rights of others, and is not contrary to the public good."
LSA-C.C. Article 12 states:
"Whatever is done in contravention of a prohibitory law, is void, although the nullity be not formally directed."
Hagberg's services under its oral contract with Bailey fall squarely within the definition of "contractors" as found in LSA-R.S. 37:2157(A).
Even though it may be conceded that James Jackson, d/b/a Jim Jackson Contractors possessed a valid Louisiana contractor's license at the time that the oral contract with Bailey was consummated, it is undisputed that J.R. Hagberg, d/b/a Jim Jackson Contractor did not have a contractor's license from the State Licensing Board for Contractors during 1980 and 1981. R.S. 37:2156(D) prohibited the transfer of the contractor's license from Jackson to Hagberg.
As a result, the properly assigned James Jackson oral contract to perform heater-scarifying work on the Lake Arthur Project became unlawful on December 15, 1980, when Hagberg began to perform contracting services without a valid license under the name of J.R. Hagberg d/b/a Jim Jackson Contractor.
Since the licensing provisions for contractors were enacted to protect an interest vital to the public order, whatever contracting *585 agreement entered into by Hagberg without the benefit of a contractor's license, having been done in contravention of a prohibitory law, is void. E.L. Burns Co., Inc. v. Cashio, 302 So.2d 297 (La.1974); West Baton Rouge Parish School Board v. T.R. Ray, Inc., 367 So.2d 332 (La.1979).

RECOVERY
The trial judge ordered recovery for Hagberg against Bailey and its insurer. We agree.
In the early stages of work Robert Abshire, president of one of Bailey's joint venturers, learned that J.R. Hagberg was purchasing the Jackson contracting firm. Although Hagberg retained a significant portion of the Jackson business logo, Hagberg did not attempt to conceal his business purchase. Hagberg's invoices to Bailey conspicuously reflect the name "J.R. Hagberg d/b/a Jim Jackson Contractor." The printing on Hagberg's business checks also indicates this same ownership name. Bailey did not raise the question of Hagberg's noncompliance with the licensing requirements until more than one year after Hagberg had completed its work on the Lake Arthur Project.
Lindsey Aucoin, Lake Arthur's City Engineer, approved Hagberg's work on the streets. Hagberg's invoices correctly reflect the amount of work performed, the rate of payment agreed to per square yard, and the price for the liquid bonding agent. Bailey acknowledged the correctness of Hagberg's invoices and their conformity with the oral agreement.
In 1973, when Jackson first applied for his Louisiana Contractor's License to perform heater-scarification work, J.R. Hagberg was listed as a superintendent of field operations with 27 years of construction experience. During J.R. Hagberg's employment with Jackson, Jim Jackson devised the heater-planer which was pivotal to this road rejuvenation method. Lake Arthur's City Engineer testified that the specifications for the Lake Arthur Project were designed specifically for the Jackson-Hagberg rejuvenation process.
At Jennings, Louisiana, J.R. Hagberg functioned as Jackson's superintendent on the heater-scarification work. This process was identical to the Lake Arthur work.
From these facts we conclude that Bailey and Hagberg entered into the Lake Arthur subcontract in good faith.
Albeit a contract made in violation of a prohibitory law is illegal and its enforcement is precluded, even though work has been done or materials furnished, the Louisiana Supreme Court in Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627 (La.1943) stated:
"If the transactions in question were malum in se, that is, essentially and inherently evil and committed contrary to the principles of natural, moral and public law, we would have no hesitancy in following the stated view. But they were not. There was nothing inherently immoral or evil about them. Their illegality resulted because they were expressly forbidden by positive law. They were malum prohibitum. The contracts being merely malum prohibitum, and not malum in se, and in view of the other circumstances hereinafter pointed out, we are forced to a conclusion that constitutes a slight departure from the doctrine of the Fox case and one that is not entirely in keeping with the expressed prevailing view."
In accord see: Smith v. Town of Vinton, 216 La. 9, 43 So.2d 18 (La.1949); Marquette v. Housing Authority of Opelousas, 137 So.2d 374 (La.App. 3rd Cir.1962); Coleman v. Bossier City, 305 So.2d 444 (La.1974).
Although Boxwell, supra, and its progeny have revolved around instances which directly affected public bodies, the rationale of those decisions has been made applicable to private individuals. Citing Boxwell, supra, the court in Scott v. Apgar, 238 La. 29, 113 So.2d 457 (La.1959) stated:
"Under the particular circumstances here presented the doctrine of ratification and estoppel is peculiarly applicable, and the defendant is not entitled to invoke a penal statute to which one may be amenable *586 in avoidance of civil obligations flowing from a contract the terms of which are not inherently evil or immoral or repugnant to public policy and good order. Boxwell v. Department of Highways, 203 La. 760, 14 So.2d 627."
We find the above cases dispositive of the issue presented here.
R.S. 37:2160(C) provides harsh penalties for the failure to procure a contractor's license: it classifies violation of the statute as a misdemeanor; and the violator is fined up to $500 a day or three months imprisonment, or both.
The purpose of the licensing requirements is the protection of the general public "against the incompetent, inexperienced, unlawful and fraudulent acts of contractors." LSA-R.S. 37:2150. This particular case does not present a situation of the type within the intended scope of protection of the licensing statute. Where incompetency or inexperience or fraudulence is not involved, the licensing statute can not be invoked to avoid payment of valid charges. Scott, supra; Boxwell, supra.
Under these particular circumstances it would be unjust to allow Bailey to benefit and escape liability for payment to Hagberg. Article 1965 of the Civil Code states in part:
"The equity intended by this rule is founded in the christian principle not to do unto others that which we would not wish others should do unto us; and on the moral maxim of the law that no one ought to enrich himself at the expense of another...."
Under the legal maxim embodied in Article 1965 of the Civil Code Hagberg is entitled to compensation under the theory of unjustified enrichment. Scott, supra; West Baton Rouge Parish School Board, supra.
In this regard we distinguish the case of United Stage Equipment, Inc. v. Charles Carter & Company, 342 So.2d 1153 (La.App. 1st Cir.1977), and the cases cited therein, Jary v. Emmett, 234 So.2d 530 (La.App. 3rd Cir.1970), writ refused, 256 La. 374, 236 So.2d 502, and Ronaldson v. Moss Watkins, Inc., 13 La.App. 350, 127 So. 467 (La.App. 1st Cir.1930) because these cases stand only for the proposition that a contract made in violation of a prohibitory law is invalid and a civil action based on the contract for money due may not be maintained. In none of these three cases was the theory of unjust enrichment or the doctrine of culpa in contrahendo argued or addressed.
In Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (La.1967) the Louisiana Supreme Court recognized an action for unjustified enrichment. "The root principal of an unjust enrichment is that an economic benefit is added to one patrimony to the economic detriment of another, without a corresponding transfer of compensation intended to be adequate."[3]
Minyard, supra, recognized five prerequisites to a successful suit founded upon an unjust enrichment:
"... (1) [T]here must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of `justification' or `cause' for the enrichment and impoverishment, and finally (5) the action will only be allowed when there is no other remedy at law, i.e., the action is subsidiary or corrective in nature."
Conditions (1), (2), (3), and (5) are readily met in the case at hand and, therefore, require little analysis. Bailey, without cost to itself, received the benefit of the heater-scarifying work on the Lake Arthur Project as a result of Hagberg's labor. Although the Town of Lake Arthur has paid Bailey for the entire Lake Arthur Project, Hagberg has not received remuneration from Bailey for its subcontracting work. Hagberg, having violated a prohibitory licensing statute, is without recourse to enforce via contract law his agreement with Bailey.
*587 Although condition (4) is also met, it, nonetheless, necessitates explanation. The crux of our consideration is that the licensing rules are not intended to permit the impoverishment-enrichment presented by the case at bar. For us to mechanically apply the general rule would result in inequity. If Hagberg had fraudulently obtained the contract, if he had been inexperienced at the work he performed, or, if his work had been substandard, our decision would be otherwise; but such is not the case.
Whereas Hagberg is subject to the criminal sanctions imposed by LSA-R.S. 37:2160(C), Bailey is "estopped from repudiating his civil obligations under a plea of absolute nullity...." Scott, supra.
In summary, it is acknowledged that R.S. 37:2150 et seq., required Hagberg to have a valid Louisiana contractor's license. However, Rule XIV of the Regulations for the Louisiana State Licensing Board for Contractors states:
"IT SHALL BE THE RESPONSIBILITY of licensed contractors to secure the current valid license number of any subcontractor who submits a bid to them or performs work in the amount of $50,000 or more. If any licensed contractor awards a contract in an amount of $50,000 to any unlicensed subcontractor the license of the contractor may be suspended, revoked or rescinded after a hearing is conducted by the board."
In addition, the contract specification for the Lake Arthur Project imposed upon Bailey the responsibility of checking all of his subcontractors for conformity with the "Louisiana Licensing Law for Contractors".
It would, therefore, be unconscionable to permit Bailey to deny payment to Hagberg because Hagberg did not have a valid Louisiana contractor's license when it was Bailey who had the correlative responsibility of confirming that Hagberg was a licensed subcontractor. This is especially unconscionable where Bailey has relied upon the work performed by Hagberg to secure payment for the job from Lake Arthur, and where Bailey did not raise the licensing issue until fifteen months after Hagberg had commenced work. We, therefore, affirm the decision of the trial court for the additional reasons of ratification and estoppel, Scott, supra; equity, Louisiana Civil Code Art. 1965; and the principle of unjust enrichment, Minyard, supra.

AMOUNT OF RECOVERY
The trial court allowed Hagberg to recover the full amount of his oral contract with Bailey together with ten per cent attorney's fee under R.S. 38:2246, and interest from the date the lien was recorded. After fully considering the law's express prohibition of contracting without a license it would be inappropriate for us to allow Hagberg to reap a profit from this venture.
Accordingly, Hagberg will be permitted to recover an amount which only represents his actual cost of the materials, services, and labor without any allowance for overhead and profits on the Lake Arthur Project. Boxwell, supra; Jones v. City of Lake Charles, 295 So.2d 914 (La.App. 3rd Cir.1974).
"An enforced settlement of this kind not only does justice and equity between the parties, but also it provides the protection... that the statute under consideration contemplates. At the same time it is notice to contractors ... must be conducted in accordance with the law's provisions; otherwise the anticipated profits and attendant expenses will be denied them and their efforts will go for naught." Boxwell, supra.
Since we have decided this case on the theory of unjustified enrichment and not under contract law, interest will be allowed on the amount recovered only from the date of final judgment. Mack Trucks, Inc. v. Capitano, 204 So.2d 710 (La.App. 4th Cir. 1967); Scott Truck & Tractor Co. of Alexandria v. Daigre, 346 So.2d 1297 (La.App. 3rd Cir.1977), writ denied, 351 So.2d 160.
The final element of recovery permitted by the trial court was an award of attorney's fees in the sum of $8,614.40. The *588 legal basis of this award is LSA-R.S. 38:2246 which provides:
"After amicable demand for payment has been made on the principal and surety, and 30 days has elapsed without payment being made, any claimant recovering the full amount of his recorded or sworn claim, whether by a concursus proceeding or separate suit, shall be allowed 10% attorney's fees which shall be taxed in the judgment on the amount recovered."
Under the requirements of the statute the award of an attorney's fee is hinged on the claimant's recovery of the full amount of his recorded or sworn claim. Goldberg v. Banta Bros., 183 La. 10, 162 So. 786 (La. 1935); R.J. Ducote Contractor, Inc. v. L.H. Bossier, Inc., 192 So.2d 179 (La.App. 1st Cir.1966); Louisiana School Supply Company v. Abraham, 209 So.2d 347 (La.App. 4th Cir.1968), writ refused, 211 So.2d 329. On the basis of our determination that Hagberg cannot recover the full amount of his contract with Bailey it is obvious that Hagberg will be unable to recover the full sum of his recorded claim; therefore, attorney's fees will be denied under the authority of R.S. 38:2246.
In order to determine the amount that Hagberg will be permitted to recover we must remand this case to the district court.

RECONVENTIONAL DEMAND
The thrust of Bailey's reconventional demand is three-fold: (1) that Hagberg's rate of production was less than promised during the negotiation of the subcontract; (2) that Hagberg unduly delayed the Lake Arthur Project when its crew left the construction site for a two-week period during the Christmas-New Year season in December, 1980 and January, 1981; (3) that Hagberg's management of the Lake Arthur Project was inadequate and inefficient.
Bailey contends that Hagberg promised to perform his portion of the work at a rate of 575 tons per day. Although Hagberg produced 475.55 tons of rejuvenation work on one occasion during the first work week, the average production figure for the Lake Arthur Project was 250 tons per day. Even though the testimony of R.L. Abshire and J.R. Hagberg were in direct conflict on this point, the statements of the project engineer and the inspector on the job were that Hagberg could not have exceeded his production. In evaluating Bailey's assertion we are further impressed by the fact that Hagberg's rate of production in Lake Arthur corresponded to that achieved on the Jennings Project.
Bailey further complains that Hagberg's work crew abandoned the Lake Arthur Project during the Christmas-New Year season. Despite Bailey's attempts to characterize Hagberg's action as arbitrary and unjustified in this regard, the trial court concluded: "There is substantial evidence that the two week `shut-down' period during the holidays was proposed by Bailey...." The trial judge's conclusion is supported by the independent testimony of the job inspector.
Bailey also alleges that J.R. Hagberg was frequently absent from the job site and his crew was left without adequate supervision. The record reflects otherwise. Although J.R. Hagberg made short trips away from the job site, he was present on a regular basis at the Lake Arthur Project until about the third week of January, 1981. In his absence Ray Osborne assumed the supervision of the rejuvenation crew. Again the trial court's determination of this matter is confirmed by the testimony of the job inspector who was the only independent party present at the job site on a daily basis. The job inspector's testimony revealed that, even in the absence of J.R. Hagberg, the rejuvenation crew followed his directions and those of Bailey's field supervisor.
Throughout the trial Bailey complained that its progress on the job was greatly delayed by Hagberg's inefficiency in refueling the heater-planer with propane. The record reflects that in the beginning Hagberg did have difficulty coordinating the delivery of propane. As a result of this problem Hagberg was forced to obtain the services of a different propane supplier. Because of the nature of the job the trial *589 court determined that these occurrences were normal and infrequent, and that Hagberg immediately made a good faith effort to prevent their recurrence by obtaining the services of an alternate supplier.
In his evaluation of Bailey's reconventional demands the trial judge also observed:
"The bid letting was in October, 1980, and the actual start of operations was later in the year. Cold and rain were frequent during that winter. Cold weather has an adverse effect on this type of project, causing the rapid cooling of the hot asphalt mix. Specifications in the contract documents required that the air temperature be at least 40 degrees fahrenheit and rising before operations could proceed and the determination as to the suitability of the weather was made by an inspector acting for the engineer who drafted the plans. Rain also hampered or prevented operations."
* * * * * *
"The weather in Lake Arthur during the term of the project was frequently too poor for work to proceed, due to cold or rain or both."
These observations point out a factor, out of the control of the contracting parties, which significantly affected the rate of production on the Lake Arthur Project.
All of the individual elements of Bailey's reconventional demand involve factual determinations. The trial court's resolution of these issues rested upon his evaluation of the credibility of the witnesses in light of the circumstances surrounding the case. Absent manifest error the trial court's determination of these issues will not be disturbed on appeal. Canter v. Koehring Company, 283 So.2d 716 (La.1973). In the case at bar we do not find that the trial court committed manifest error in its determination of these issues.

DECREE
For the above and foregoing reasons we reverse the trial court judgment in so far as it allows plaintiff recovery from defendants of attorney's fees and interest on the amount of recovery from date of the lien filing and plaintiff's demands in this regard are ordered dismissed with prejudice. Further the judgment of the trial court is ordered amended so as to allow plaintiff recovery from defendants on the principal demand of only such amount as will represent the actual cost of the materials, services, labor, etc., furnished by plaintiff pursuant to the contract, but without allowance for overhead and profits, with interest on such amount ultimately recovered from date of judgment until paid and this matter is remanded to the trial court for further proceedings in order to determine the amount owed by defendant to plaintiff. In all other respects the judgment of the trial court is affirmed. Costs of this appeal are taxed one-half to plaintiff and one-half to defendants.
AFFIRMED IN PART, REVERSED IN PART, AMENDED IN PART, AND REMANDED.
NOTES
[1] Subject, however, to the exceptions enumerated in LSA-R.S. 37:2157.
[3] Tate, The Louisiana Action for Unjustified Enrichment: A Study in Judicial Process, 51 Tul.L.Rev. 446 (1977).