STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

2018 CA 1543

QUATERNARY RESOURCE INVESTIGATIONS, LLC

VERSUS

RONALD DAVID PHILLIPS AND ANGELA PHILLIPS

JUDGMENT RENDERED: **NOV 1 9 2020**

* * * * * * *

Appealed from the
Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge • State of Louisiana
Docket Number 607547 • Section 22

The Honorable Timothy E. Kelley, Judge Presiding

* * * * * * *

| | |
|---|---|
| G. Steven Duplechain<br>T. Michael Murphy<br>Baton Rouge, Louisiana | ATTORNEYS FOR APPELLANT,<br>PLAINTIFF/DEFENDANT-IN-<br>RECONVENTION—Quaternary<br>Resource Investigations, LLC |
| J. Mark Robinson<br>Baton Rouge, Louisiana | ATTORNEYS FOR APPELLEES,<br>DEFENDANTS/PLAINTIFFS-IN-<br>RECONVENTION—Ronald David<br>Phillips and Angela Phillips |

* * * * * * *

BEFORE: MCCLENDON, WELCH, THERIOT, CHUTZ, AND LANIER, JJ.

**WELCH, J.**

In this owner-contractor dispute over renovations to and construction of an addition to an existing home, the defendants/plaintiffs-in-reconvention—Ronald David Phillips and Angela Phillips (collectively, "the Phillips")—appeal the trial court's judgment rendered in favor of the plaintiff/defendant-in-reconvention—Quaternary Resource Investigations, LLC ("QRI")—in the amount of $141,876.72. For the following reasons, we reverse in part, affirm in part, amend in part, and affirm as amended.

## FACTUAL AND PROCEDURAL HISTORY

### *Background*

QRI entered into a construction contract with the Phillips to renovate and add a substantial residential addition to their home at 7211 Garrison Lane, Denham Springs, Louisiana (the "project"). The contract, dated June 1, 2010, set the cost of construction initially at $214,148.07, and by change order dated May 6, 2011, increased the contract price by $18,047.39, for a total contract price of $232,195.46. There was no time period set forth in the contract for the completion of the project. A year and a half later, QRI was still performing construction work on the project, when on January 6, 2012, the Phillips terminated the contract with QRI because of issues with the quality of QRI's workmanship and upon learning that QRI did not possess the required residential building contractor's license to perform the construction work. At the time of termination, the Phillips had paid QRI $210,780.63 toward the contract price of $232,195.46. A balance remained in the amount of $21,414.80, which is the amount of the contractually agreed-upon ten percent retainer.

Prior to contracting with QRI, the Phillips met with Paul Henderson, an experienced, independent residential home improvement contractor, to discuss the renovations and addition to their home. As the Phillips' design plans evolved, Mr.

2

Henderson realized that the project would exceed the limitations of his home improvement contractor's license, which licensed him to perform construction work on residential projects valued at *less than* $75,000.00. Mr. Henderson advised the Phillips that he could not undertake their project.

Then, in 2009, Mr. Henderson began working for QRI—which he described as a large corporation—as its "construction manager," and resumed his discussions with the Phillips regarding their project. Mr. Henderson told the Phillips that QRI possessed all the necessary licenses to renovate and construct an addition to their home. Based on his representations, the Phillips entered into the contract with QRI on June 1, 2010.

However, QRI did not possess the required residential building contractor's license. On June 18, 2009—almost a year before entering into the contract with the Phillips—QRI obtained a Home Improvement Contractor's license from the Louisiana State Licensing Board ("Board"), allowing QRI to bid, contract, and perform work on residential construction projects valued at *less than* $75,000.00. In addition to that license, the Board sent QRI a separate transmittal letter, dated June 24, 2009, reiterating the fact that QRI was required to "obtain a State residential building license to bid, contract, perform work, or be issued a permit for the remodel, repair, alteration, or addition to an existing home where the cost is $75,000.00 or more."

In September 2010, after QRI had begun construction work on the Phillips' project, Mr. Phillips confronted Mr. Henderson with concerns regarding information he had obtained from the Board wherein he discovered that QRI did not possess the required residential building contractor's license. At the trial of this matter, Mr. Henderson testified about the September 2010 incident as follows:

> Mr. Phillips came to me in September, sometime, of that year, and said that he had found out that we did not have the proper licensure. He had spoken with the state

licensing board, I believe; called [Carl] Bourque [sic], specifically. And so, I called Carl and spoke with him[,] and he did confirm that the licensure [QRI] had did not cover that particular situation.

In response to Mr. Phillips' questioning, Mr. Henderson walked the Phillips out to where a building permit was posted on their property, pointed to the permit and said, "they've issued the permit. We're covered." However, Mr. Henderson admitted at trial that the permit was improperly issued by Livingston Parish based on QRI's commercial contractor's license number. Mr. Henderson claimed that when he spoke with Mr. Bourque of the Board later that day, Mr. Bourque told him that the failure of QRI to have the required license was "not a big deal," and that QRI could continue construction work on the Phillips' project as long as it applied for the required license. That same day, Mr. Henderson spoke with Kenneth New, the President of QRI, and informed him about the call with Mr. Bourque and the licensing issue. QRI never advised the Phillips about Mr. Henderson's call to the Board, but Mr. Henderson did tell the Phillips that QRI was "taking care" of the licensing issue.

Soon thereafter, in October 2010, QRI submitted an application to the Board for a residential building contractor's license while continuing construction work on the Phillips' project. On November 29, 2010, after receiving QRI's application, the Board sent QRI a letter, advising as follows:

> We **caution** that you are not eligible at this time to bid, contract, perform work, or be issued a permit for residential construction in the amount of $75,000 or more...."

(Emphasis in original). Despite receiving clear notification from the Board that QRI was not licensed to perform the residential construction work that was required on the Phillips' project, QRI did not disclose the November 29, 2010 letter to the Phillips and continued construction work on the project without the legally required license. On May 6, 2011, QRI and the Phillips agreed to a change

4

order in the amount of $18,047.39. At trial, Mr. Henderson testified that QRI did not include profit when calculating the change order amount because his understanding was that QRI was not entitled to charge the Phillips for profit due to QRI's failure to have the required license.

Ultimately dissatisfied with the poor quality of QRI's workmanship on the project, and again contacting the Board and learning that QRI still did not possess the required residential building contractor's license, the Phillips terminated their contract with QRI on January 6, 2012. At the time of termination, the Phillips had already paid QRI $210,780.63 toward the contract price of $232,195.46, with a balance remaining in the amount of $21,414.80, which is the amount of the contractually agreed-upon ten percent retainer.

That same day, the Phillips filed a consumer complaint with the Board, contending that QRI misrepresented to them that it was properly licensed to undertake the construction work on their residential project because QRI was never licensed at any time during the pendency of the Phillips' contract to perform the construction work on their residential project.

Following review of the Phillips' complaint, the Board ordered QRI to cease and desist any residential construction work it may have been performing. The Board further ordered QRI to appear for a hearing on its violation of the Louisiana State Contractors Licensing Law, La. R.S. 37:2150-2175.6, and specifically La. R.S. 37:2167(A), which requires all residential building contractors to obtain and maintain an active license in accordance with the licensing statute. Following a hearing, the Board found QRI in violation of the Contractors Licensing Law and fined it $500.00. The Board ultimately issued QRI a residential building contractor's license on January 24, 2012, licensing QRI to contract and perform construction work on residential projects at or in excess of $75,000.00.

## Proceedings in the Nineteenth Judicial District Court ("19th JDC")

QRI filed a petition against the Phillips, alleging that the Phillips owed QRI $21,414.80, plus costs and legal interest pursuant to the terms of the June 1, 2010 contract. QRI averred that it substantially completed all construction work on the Phillips' project on April 25, 2011, and alleged that the Livingston Parish Building & Permit Department issued a certificate of occupancy. QRI further alleged that the Phillips took occupancy of the renovations and addition to their home on April 25, 2011, but refused to pay QRI the ten percent retainer amount of $21,414.80 owed to it under the contract. QRI acknowledged that some "warranty items" existed that it had attempted to resolve, but claimed that the Phillips refused to allow QRI to complete the "warranty work."

QRI later amended its petition, increasing the alleged sum owed by the Phillips to $44,344.65. In addition to the ten percent retainer amount of $21,414.80, QRI alleged that it was owed an additional $20,691.85 for "labor and materials, administrative costs, overhead and profit," as well $2,238.00 for roof warranty repair work because the Phillips allegedly "insisted that a roofer of their selection perform warranty work[,] which cost $2,238.00 more than the warranty repairs if performed by" QRI.

The Phillips answered QRI's petitions, raising affirmative defenses and asserting a reconventional demand against QRI.[1] The Phillips denied that QRI's construction work on their residential project pursuant to the June 1, 2010 contract was ever substantially completed. The Phillips alleged the affirmative defense of compensation, contending that QRI was paid more than it was due, insofar as the work it undertook on their project was incomplete, faulty, not timely completed, not completed in a workmanlike manner, not completed according to the plans and

---

[1] The Phillips also filed a first and second restated, amending, and supplemental answer and a first and second amended reconventional demand.

specifications, and that any variances undertook by QRI were not authorized through written change orders. The Phillips alleged that QRI breached fiduciary duties and obligations, which necessitated that the Phillips hire professional consultants to identify and discover problems caused by QRI's defective work and offer solutions to repair the damage. The Phillips also alleged the affirmative defense of estoppel, claiming that QRI had no further rights due to its poor workmanship and its misrepresentations and misleading statements regarding its lack of a proper residential building contractor's license.

In their reconventional demand, the Phillips alleged that QRI made false and intentional misrepresentations, which led them to believe that QRI was properly licensed to perform the construction work on their residential project pursuant to the contract. The Phillips set forth a list of substandard, defective, and incomplete items that QRI failed to properly construct. The Phillips contended that QRI's poor construction work, delays, misrepresentations, fraud, and failure to properly complete the residential construction work on their project entitled them to damages for: the cost to complete and repair the defective and incomplete construction (including the original home bedroom, bathroom, kitchen, utility room, ceilings, upper walls, roof, and mold issues); the cost to hire a professional home inspector/consultant to identify problems; the cost for paying the construction loan interest rates beyond the promised completion date; mental anguish; fraud and misrepresentation; and attorney's fees. The Phillips further alleged that because QRI acted fraudulently and used deceptive practices, it was liable to them for damages and attorney's fees pursuant to the Louisiana Unfair Trade Practices Act, LUTPA, La. R.S. 51:1401-1418. The Phillips later amended their reconventional demand, alleging that due to QRI's failure to hold an active license to engage in residential building construction at or in excess of $75,000.00 as required by the Contractor's Licensing Law, the June 1, 2010 contract was an

7

absolute nullity and void *ab initio*. The Phillips contended that QRI should not be allowed to receive any profit or overhead. The Phillips also alleged that they should be reimbursed for all profit, overhead, and any other funds paid by them to QRI.

In response to the Phillips' reconventional demand, QRI filed an amended petition. Therein, QRI alleged that should the trial court deem the June 1, 2010 contract an absolute nullity due to QRI's improper licensure, QRI claimed that it was entitled to recover under the theory of unjust enrichment, *actio de in rem verso* principles, or *quantum meruit*. QRI contended that the construction work it performed on the Phillips' residential project cost it $389,962.38 in labor, equipment, and overhead. QRI alleged that the Phillips had only paid it $192,733.27, so it was owed an additional $197,229.11 "in equity" under the theory of unjust enrichment.[2]

The matter proceeded to a bench trial on August 8, 2016, which recessed on August 11, 2016. The trial court rescheduled the trial to resume on January 23, 2017. At that time, the parties consented to the trial court's appointment of a Special Master to preside over the matter and make factual findings and legal conclusions relating to all issues raised by the parties in the pleadings and evidence and to make a recommendation to the trial court on any potential quantum award.

***Proceedings Before the Special Master***

The trial court appointed John T. Andrishok, an experienced construction lawyer, as Special Master to hear and make a recommendation regarding this case. The Special Master heard thirteen days of testimony, including competing experts, and made factual findings regarding the renovations and construction of the addition to the Phillips' home by QRI. The Special Master issued his "Report and

---

[2] The Special Master *and* the trial court found that the Phillips had paid QRI $210,780.63 toward the contract price of $232,195.46, with a balance remaining in the amount of $21,414.80, which is the amount of the contractually agreed-upon ten percent retainer.

Recommendation" to the trial court on October 31, 2017. Therein, the Special Master recommended that the trial court dismiss all of QRI's claims and that judgment be rendered in favor of the Phillips, against QRI, in the amount of $156,463.57, plus legal interest and costs.

The Special Master found that "QRI did not possess a Residential Building Contractor's license[,] and therefore[,] the contract entered into with the Phillips was *void ab initio* [*sic*]. As such, any claims for breach of contract are rejected, as previously determined, and QRI's claims are limited to unjust enrichment or *quantum meruit*." The Special Master held that QRI's actions did not rise to the level of "fraud, incompetence[,] or inexperience necessary to defeat a claim of *quantum meruit*." The Special Master continued:

> While the contract is void, as a matter of equity and in the interest of justice, the Phillips are entitled to enforce the basic payment provisions of the contract in defense of the claims of QRI. [See La.] C.C. art. 2033[,] which provides that performance may be recovered when "recovery would further the interest of justice." Accordingly QRI's claims for sums over and above the contract sum are rejected. Additionally, claims for the contract balance of $21,414.80 are similarly rejected as the evidence established that the work was not completed[,] and QRI is not entitled to the final [ten percent] payment under the payment schedule set forth in the proposal.

In so ruling, the Special Master wholly rejected QRI's claims it was entitled to any sum over and above the contract price, including the $188,169.23[3] in excess costs QRI claimed it incurred during the project. The Special Master also found that the Phillips' claims were not barred by the Louisiana New Home Warranty

---

[3] The source of the $188,196.23 amount claimed by QRI (as quoted by the Special Master in his report) is unclear. In its amended petition, QRI alleged entitlement to $197,229.11 under the theory of unjust enrichment.

Act ("NHWA").[4] The Special Master recommended dismissal of the Phillips'
claims under LUTPA.

Regarding the Phillips' claims for damages for QRI's poor workmanship,
the Special Master found that "[t]he evidence at the trial established that the work
of QRI was, in many cases, incomplete and defective." The major categories of
incomplete and/or defective work as found by the Special Master were:

1) Pier and Beam defects

    a. Structures built by QRI were moving due to inadequate support.

        i. Piers and girders were offset, resulting in lateral stress on the structure.

        ii. Girders were spliced together in incorrect locations where there is inadequate support.

        iii. Piers were incorrectly spaced more than 8 feet 3 inches center to center, whereas the design required a spacing of no more than 7 feet 3 inches.

        iv. Joint hangers were incorrectly installed and more than 50% were failing.

        v. Trim work was separating as a result of the incorrectly installed joint hangers.

        vi. Tiles cracked.

        vii. Floor between the center girder and porch girder was bowing.

        viii. Floor joists were not tied to the foundation.

        ix. Piers (concrete masonry units, or "CMUs") were leaning. If someone pushed on the house, it could be pushed off its foundation.

    b. Conclusion: QRI did not follow the construction drawings nor the applicable building codes. The construction of the pier and beam foundation system was totally incorrect and defective.

    c. Cost to repair: $86,314.78.

2) Leaking Roof

    a. The leaking began immediately after QRI installed the new roof.

        i. Roof was incorrectly installed.

---

[4] In its objections to the Special Master's "Report and Recommendation," QRI noted that it had previously asserted that the claims of the Phillips were barred by the NHWA.

ii. Roofing materials had excessive and permanent penetrations throughout.

iii. Roofing materials did not match existing roof as called for in the construction plans.

iv. Roof slope violated the manufacturer's recommendations regarding minimum slope in some areas.

v. Cost to repair: $9,500.00.

3) Damage to Exterior Wood Siding

a. QRI defectively installed exterior wood siding.

i. Deficient installation.

ii. Overdriving nails.

iii. Failed to use non-corrosive nails in violation of standard construction practices.

b. Cost to repair: $13,250.00.

4) Expert Witness Fee of Robert Gregory

a. Cost: $28,689.79.

In addition to those major construction defects, the Special Master awarded the Phillips $18,709.00 for items that were not constructed or were defectively constructed. The Special Master recommended that the total amount of damages awarded to the Phillips for construction defects be $127,773.78, plus the expert witness fee of $28,689.79, for a total damage award to the Phillips of $156,463.57, plus legal interest from the date of judicial demand—February 15, 2012—until paid, plus court costs, including the cost of the Special Master.

***The Trial Court's Judgment***

Following receipt of the Special Master's "Report and Recommendation," as well as the parties' objections thereto, the trial court rendered judgment on April 30, 2018, as follows:

> The demand of plaintiff, Quaternary Resource Investigations, LLC, is GRANTED and Judgment in the amount of $179,181.72 is awarded to plaintiff;
>
> The Reconventional Demand of defendants, Ronald David Phillips and Angela Phillips, is

11

GRANTED and Judgment in the amount of $37,305.00[5] is awarded to defendants. Therefore:

Applying the amount awarded defendants to the award to plaintiff results in a Judgment in favor of plaintiff, in full and final resolution of all issues in this case, in the amount of $141,876.72.[6] Interest to run from the date of judicial demand. All costs assessed against defendants.

In its written reasons issued that same day, the trial court noted that it disagreed with two of the Special Master's findings: that the NHWA did not apply to the Phillips' project; and that QRI's recovery was limited to the contract amount pursuant to the "interest of justice" language contained in La. C.C. art. 2033.[7]

The trial court held that the NHWA applied to the construction of additions to homes as well as the construction of new homes; accordingly, QRI was entitled to the exclusions defined in the NHWA. The trial court found that because the Phillips did not comply with the notice requirements of the NHWA regarding foundation defects, the Phillips were not entitled to recover $86,314.78 for the remediation of the foundation.

The trial court agreed with the Special Master that the June 1, 2010 contract was void *ab initio* and that QRI was entitled to recover under the theory of unjust enrichment/*quantum meruit* pursuant to La. C.C. art. 2298; however, the trial court disagreed with the Special Master's finding that La. C.C. art. 2033's "interest of justice" language limited QRI's recovery to the amount specified by the contract. The trial court reasoned:

The evidence shows that, without any mark up for profit or overhead, [QRI] expended actual hard costs of $389,962.38. The [Phillips] have previously paid [QRI] $210,780.66. Therefore, **[QRI] is entitled to recovery**

---

[5] This amount should be $39,479.00. See n.8, *infra*.

[6] This amount should be $139,702.72. See n.8 and n.10, *infra*.

[7] In the present case, the trial court amended, and affirmed as amended, the Special Master's findings of fact and conclusions of law. Thus, the trial judge functioned as the ultimate fact finder and adjudicator of the law in this case. See **Adams v. Union Pac. R.R. Co.**, 2018-903 (La. App. 3rd Cir. 5/29/19), 273 So. 3d 419, 425 n.4.

12

**from the [Phillips] the amount of $179,181.72, less the [Phillips'] cost to correct deficient work by [QRI]. ...**

In reviewing the items that the Special Master found to be recoverable by the [Phillips], this Court finds that the following items are not supported by the evidence: (1) Item 3 ($1,000.00) is denied due to the [Phillips'] tacit acceptance of the work as performed, and (2) Item 4 ($980.00) is denied as the [Phillips] actually collected for this item through [their] flood insurance and, having recovered for an item that the [Phillips say] was not provided by [QRI], would amount to double recovery by the [Phillips]. This Court agrees with all other determinations of the Special Master. ... **These items total $37,305.00.**[8] The [Phillips'] reconventional demand is granted in this amount.

Therefore, [QRI] is entitled to $179,181.72, less $37,305.00[9] to correct deficiencies in [its] work, for a **total recovery to [QRI] of $141,876.72.**[10]

(Emphasis in original). The Phillips have suspensively appealed the trial court's

April 30, 2018 judgment.

## ASSIGNMENTS OF ERROR

The Phillips assign the following errors to the trial court's judgment:

(1) The trial court erred by applying the [NHWA] to the facts of this proceeding[,] thereby barring from recovery many of the claims of the Phillips;

(2) The trial court erred by failing to limit QRI's recovery to the contract amount pursuant to the "interest of justice" language contained in [La. C.C. art.] 2033;

(3) The trial court erred by failing to find [that] QRI perpetuated fraud upon the Phillips based upon QRI's representation to the Phillips that it was properly licensed to perform the work required by the contract when QRI had actual knowledge that it was not properly licensed;

(4) The trial court erred by failing to award the Phillips attorney's fees based upon QRI's fraudulent actions;

---

[8] This figure represents a miscalculation error by the trial court and should be $39,479.00. The amount the trial court awarded to the Phillips included the cost for the replacement of roof materials ($9,500.00), as well as the costs for all the items that the Special Master found to be defective or incomplete ($31,959.00), minus the two items the trial court denied herein ($1,000.00 and $980.00), for a total of $39,479.00.

[9] This amount should be $39,479.00. See n.8, *supra*.

[10] This amount should be $139,702.72. See n.8, *supra*.

13

(5) The trial court erred by failing to award the total amount of damages to the Phillips supported by the evidence; [and]

(6) The trial court erred by failing to disgorge all payments made to QRI by the Phillips based upon a void contract in light of the incompetency or inexperience or fraudulence of QRI[.]

## LAW AND DISCUSSION

## EFFECT OF UNLICENSED CONTRACTOR ON THE VALIDITY OF A CONSTRUCTION CONTRACT; APPLICABILITY OF THE NHWA

The Phillips argue that contrary to the finding of the Special Master, the trial court erroneously applied the NHWA to the facts of this matter, which barred recovery on some of their claims.[11] The Phillips contend that the June 1, 2010 contract is an absolute nullity and void *ab initio* because QRI failed to possess the required residential building contractor's license when it contracted with the Phillips and performed residential construction work pursuant to that contract. The Phillips argue that the NHWA does not apply to null and void contracts. Phillips further aver that the NHWA does not apply to additions to existing homes. Because this issue involves the interpretation of a statute, it is a question of law, and is thus reviewed by this court using a *de novo* standard of review. **Red Stick Studio Dev., L.L.C. v. State ex rel. Dep't of Econ. Dev.**, 2010-0193 (La. 1/19/11), 56 So. 3d 181, 187.

### *Nullity of the June 1, 2010 Contract*

The Louisiana Legislature has enacted a broad licensing scheme for contractors who contract and perform work in this State. The purpose of the Legislature in enacting the Contractors Licensing Law—La. R.S. 37:2150-2175.6—is found at La. R.S. 37:2150, which provides, in pertinent part:

> The purpose of the legislature in enacting this Chapter is the protection of the health, safety, and general welfare of all those persons dealing with persons engaged in the contracting vocation, and the affording of such persons of

_____

[11] See Phillips' Assignment of Error No. 1.

14

> an effective and practical protection against the **incompetent, inexperienced, unlawful,** and fraudulent acts of contractors with whom they contract.

(Emphasis added).

Louisiana Revised Statutes 37:2160 provides, in relevant part:

> A. (1) It shall be **unlawful for any person to engage** or to continue in this state **in the business of contracting, or to act as a contractor** as defined in this Chapter, **unless he holds an active license as a contractor** under the provisions of this Chapter.
>
> (2) It shall be unlawful for any contractor, licensed or unlicensed, who advertises in any form or in any news medium, to advertise that he is a licensed contractor without specifying the type of license to which he is referring.
>
> ***
>
> C. (1) **Anyone violating this Section of this Chapter shall be guilty of a misdemeanor** and, upon conviction, shall be fined a sum not to exceed five hundred dollars per day of violation, or three months in prison, or both.
>
> (2) Notwithstanding any action taken by the board, any person, who does not possess a license from the board, and who violates any of the provisions of this Section, and causes harm or damage to another in excess of three hundred dollars, upon conviction, shall be fined not less than five hundred dollars nor more than five thousand dollars, or imprisoned, with or without hard labor, for not less than six months nor more than five years, or both.

(Emphasis added).

Louisiana Revised Statutes 37:2167(A) further provides that "[n]o person shall work as a residential building contractor in this state unless he holds an active license in accordance with the provisions of this Chapter." See also La. Admin. Code 46:XXIX.709(A).[12]

According to La. R.S. 37:2160(A) and La. R.S. 37:2167(A), it is unlawful for a contractor or builder—who is required to be licensed by the Board—to enter into a construction contract or work as a residential building contractor without the

---

[12] "Any person duly licensed or registered under the provisions of the Contractors Licensing Law who violates any provision [thereof]…or any rule or regulation of the board may, after due hearing, be required to pay fines and costs and have its license or registration suspended or revoked by the board." La. Admin. Code 46:XXIX.709(A).

proper license. These provisions were specifically enacted by the Legislature so that an unqualified individual operating in the professional field as a contractor could not injure or mislead the State's citizens. See **Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, L.L.C.,** No. CIV A 06-593 (E.D. La. Apr. 20, 2007), 2007 WL 1191896, at \*3, aff'd, 578 F.3d 255 (5th Cir. 2009).

Louisiana Civil Code article 2029 provides that "[a] contract is null when the requirements for its formation have not been met." Additionally, La. C.C. art. 2030 provides:

> A contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral. A contract that is absolutely null may not be confirmed.
>
> Absolute nullity may be invoked by any person or may be declared by the court on its own initiative.[13]

Furthermore, La. C.C. art. 7 provides that "[p]ersons may not by their juridical acts derogate from laws enacted for the protection of the public interest. Any act in derogation of such laws is an absolute nullity."

There is absolutely no dispute that during the entire time QRI undertook residential construction work on the Phillips' project, QRI did not possess the required residential building contractor's license. Mr. Henderson admitted that from the contract date of June 1, 2010, to January 6, 2012, when the Phillips terminated the contract with QRI, QRI did not possess the required residential building contractor's license. Accordingly, the June 1, 2010 contract violates La. R.S. 37:2160(A) and La. R.S. 37:2167(A), which are rules of public order requiring contractors to be properly licensed to contract and perform work. Any contract made in violation of the Contractors Licensing Law is null and void. See **Tradewinds,** 2007 WL 1191896 at \*3. Therefore, we agree with the finding of

---

[13] The Phillips invoked the absolute nullity of the June 1, 2010 contract in their amended reconventional demand.

both the Special Master and the trial court that the June 1, 2010 contract is an absolute nullity and is void *ab initio*.

### *Applicability of the NHWA to "Additions" versus "New Homes"*

While the Special Master concluded that the NHWA "only applies to the construction of new residences," the trial court rejected the Special Master's finding and held that the NHWA "contemplates the construction of new structures that are for residential use only[,] which can be 'additions' to existing structures." The trial court ruled that the NHWA applied to the renovations and addition to the Phillips' home, and that QRI was entitled to the exclusions defined by the NHWA.

Louisiana Revised Statutes 9:3141 sets forth the purpose of the NHWA, providing, in pertinent part:

> The legislature finds a need to promote commerce in Louisiana by providing clear, concise, and mandatory warranties for the **purchasers and occupants of new homes** in Louisiana and by providing for the use of homeowners' insurance as additional protection for the public against defects in the **construction of new homes**. This need can be met by providing a warranty for a **new home purchaser** defining the responsibility of the builder to that purchaser and subsequent purchasers during the warranty periods provided herein.

(Emphasis added). The NHWA "provides the exclusive remedies, warranties, and peremptive periods as between **builder** and **owner** relative to home construction and no other provisions of law relative to warranties and redhibitory vices and defects shall apply." La. R.S. 9:3150. (Emphasis added). Additionally, the legislative history of the NHWA suggests that the Act was intended to apply to newly constructed homes.[14] Thus, the legislative purpose and history indicates that

---

[14] The legislative history of a statute and related legislation provides a particularly helpful guide in ascertaining the intent of a statute. **Theriot v. Midland Risk Ins. Co.**, 95-2895 (La. 5/20/97), 694 So. 2d 184, 186. As noted in **Dalme v. Blockers Manufactured Homes, Inc.**, 2000-00244 (La. App. 3rd Cir. 1/25/01), 779 So. 2d 1014, 1019 n.2, writ denied, 2001-1246 (La. 6/15/01), 793 So. 2d 1248, the following comments regarding the purpose of NHWA were made in the Louisiana Senate and House:

> Mr. Sidney Fazio presented this bill and explained it would clarify the present law and do away with the perpetual warranty that presently exists for home builders.

the construction project at issue in this case, an addition to an existing residence, would not fall under the NHWA.

As correctly pointed out by QRI, however, there is jurisprudence holding that the plain language of the NHWA demonstrates that "a builder need not construct the entire home to qualify as a builder, where the construction of a mere addition to a home suffices." See **Palermo v. Homes & More, Inc.**, 2019-295 (La. App. 3rd Cir. 12/18/19), 286 So. 3d 557, 563 ("[A] clear reading of the statute reveals that a 'builder' is one that 'constructs a home, *or addition thereto*[.]' La. R.S. 9:3143(1).")[15] The NHWA defines a "[b]uilder" as "any person, corporation, partnership, limited liability company, joint venture, or other entity which constructs a home, or addition thereto...." See La. R.S. 9:3143(1). An "[o]wner" is defined by the NHWA as "the initial purchaser of a home and any of his successors in title, heirs, invitees, or assigns to a home during the time the

<hr>

It would provide for exclusive warranties of residential home builders to owners of **newly constructed homes.**

(Original emphasis omitted). (Emphasis added). Minutes of Meeting of May 13, 1986, of the Committee on the Judiciary, Senate, Louisiana Legislature, on Senate Bill No. 57 by Senator Bares, p. 7.

Representative Thompson presented Senate Bill 57[,] which provides for express and exclusive warranties of residential home builders for **newly constructed homes.**

(Original emphasis omitted). (Emphasis added). Minutes of Meeting of June 9, 1996, of the Civil Law and Procedure Committee, House of Representatives, Louisiana Legislature, on Senate Bill No. 57 by Senator Bares, p. 2.

Mr. Johnny Koch, Louisiana Homebuilders Association,...appeared before the committee in support of Senate Bill No. 413. He stated that the New Home Warranty Act would define the rights, duties, and responsibilities of a **new home purchaser** and a **new home builder.**

(Original emphasis omitted). (Emphasis added). Minutes of the Meeting of May 17, 1999, of the Commerce Committee, House of Representatives, Louisiana Legislature, on Senate Bill No. 413 by Senator Heitmeier, p. 2.

[15] In **Palermo**, 286 So. 3d at 564, the Third Circuit held that a construction company serving as the general contractor on a new home construction project—without actually constructing the entire house itself—was a "builder" within the meaning of the NHWA. Thus, the NHWA excluded the property owner's claims against the construction company for consequential damages and mold damage. But-for the construction company's involvement in the new home construction, the Third Circuit held that the newly completed home would not have been delivered to the property owners. As the general contractor, the construction company was contractually responsible for ensuring that the structure was fully built and for delivering the completed property to the owners as a new home.

warranties provided under this Chapter are in effect." La. R.S. 9:3143(6). A "[h]ome" is defined as "any new structure designed and used only for residential use...constructed by the builder[.]..." La. R.S. 9:3143(3).

However, whether the NHWA applies solely to "new homes" or residential "additions" is of no moment in this specific case because the prerequisite to engage in any residential construction—new home or otherwise—requires a residential builder or contractor to hold the proper license pursuant to the Contractors Licensing Law. For example, it would be illogical under the NHWA to require owners to send notice to a unlicensed builder via certified mail[16] of any defects in the renovation or construction of an addition to a home when it was illegal for that unlicensed builder—under La. R.S. 37:2160(A) and La. R.S. 37:2167(A)—to build the structure in the first place. Therefore, we make no pronouncement on whether the NHWA applies to "new homes" and/or "additions."

We hold that the NHWA does not apply in this case because the June 1, 2010 contract is absolutely null and void *ab initio* due to QRI lacking the proper residential building contractor's license at all pertinent times herein. Accordingly, we find that the trial court erred in applying the NHWA to the Phillips' claims.

## UNLICENSED CONTRACTOR RECOVERY IN THE ABSENCE OF CONTRACT OR NULLITY OF CONTRACT

The Phillips aver that based upon QRI's actual knowledge that it was not properly licensed to contract or perform work on the project, QRI's actions amounted to fraud, incompetency, and inexperience that resulted in defective, substandard, and incomplete renovations and additions to their home, precluding them from recovering under the theory of unjust enrichment. The Phillips further contend that the trial court erred by not finding that QRI committed fraud and erred

---

[16] See La. R.S. 9:3145.

in failing to award them attorney's fees based on said fraud.[17] Finally, the Phillips argue that the trial court erred by failing to limit QRI's recovery to the contract amount pursuant to the "interest of justice" language contained in La. C.C. art. 2033.[18] Mixed questions of law and fact are subject to the manifest error standard of review. The two-part test for the appellate review of a factual finding is: (1) whether there is a reasonable factual basis in the record for the finding of the trial court, and (2) whether the record further establishes that the finding is not manifestly erroneous. If a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. **Marietta Tr. v. J.R. Logging Inc.**, 2016-1136 (La. App. 1st Cir. 5/11/17), 225 So. 3d 1144, 1147-48, writ denied, 2017-1751 (La. 12/5/17), 231 So. 3d 631.

### *Unjust Enrichment*

Since it is illegal for a contractor to enter into a contract without being properly licensed, the court will not enforce an illegal contract by allowing a contractor to recover damages for breach of that contract. See **United Stage Equip., Inc. v. Charles Carter & Co., Inc.**, 342 So. 2d 1153, 1154-55 (La. App. 1st Cir. 1977). In **Boxwell v. Dep't of Highways**, 14 So. 2d 627, 631 (La. 1943), the Louisiana Supreme Court held that a contract made in violation of a prohibitory law is illegal and its enforcement is precluded, even though work has been done or materials furnished, and further, "neither can recovery be had on a [*quantum meruit*] basis."[19] However, under the theory of unjust enrichment, the Supreme Court ruled that the vendor could recover the actual cost of its materials, labor, and

---

[17] See Phillips' Assignments of Error Nos. 3 and 4.

[18] See Phillips' Assignment of Error No. 2.

[19] **Boxwell** addressed the effect of absolutely null contracts on a vendor's right to collect for materials sold to the Louisiana Highway Commission. 14 So. 2d at 629. The Supreme Court found that the sales were made in violation of a public works statute requiring advertising and public bidding; thus, the contracts were illegal and unenforceable, and the vendor was precluded from recovery on a *quantum meruit* basis. **Id.** at 631.

services, without recovery of any profit or overhead expenses. **Id.** at 632. The Supreme Court held:

> The evidence discloses the existence of no fraud on the part of either the Louisiana Metal Culvert Company or the Highway Commission in the consummation of the sales. Furthermore, both parties were equally guilty in failing to respect the mandate of the statute—the vendee neglecting to advertise for bids and the vendor selling and delivering its merchandise in the regular course of business. Also, the materials were received and accepted by the Commission; and it used them for the benefit of itself and of the people represented.
>
> Under these circumstances[,] it would clearly be unjust to permit the Commission to reap the mentioned benefits and escape liability for them altogether. There is imbedded deeply in our civil law the maxim that no one ought to enrich himself at the expense of another. Revised Civil Code, Article 1965. On the [other] hand, considering the law's expressed prohibition for making the sales in the manner shown it would also be improper for the vendor to profit by the transactions.

**Id.** at 632. The Supreme Court has applied the rationale of **Boxwell** (involving a public works contract) to private individuals and contracts. See **Scott v. Apgar**, 113 So. 2d 457, 460 (La. 1959).

The root principle of unjust enrichment is that the plaintiff suffers an economic detriment for which he should not be responsible, while the defendant receives an economic benefit for which he has not paid. **State By & Through Caldwell v. Fournier Industrie et Sante**, 2017-1552 (La. App. 1st Cir. 8/3/18), 256 So. 3d 295, 303, writ denied, 2018-2065 (La. 4/8/19), 267 So. 3d 607. Louisiana Civil Code article 2298, titled "Enrichment without cause; compensation," provides:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides

21

another remedy for the impoverishment or declares a contrary rule.

The amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less.

The extent of the enrichment or impoverishment is measured as of the time the suit is brought or, according to the circumstances, as of the time the judgment is rendered.

To prevail on an unjust enrichment claim, the plaintiff must prove by a preponderance of the evidence all five elements: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the resulting impoverishment; (4) an absence of justification or cause for the enrichment and impoverishment; and (5) the lack of another remedy at law.[20] See **Minyard v. Curtis Prod., Inc.,** 205 So. 2d 422, 432 (La. 1967), and **Berthelot v. Berthelot,** 2017-1332 (La. App. 1st Cir. 7/18/18), 254 So. 3d 735, 738.

Thus, using the theory of unjust enrichment, the Supreme Court limits the recovery of unlicensed contractors to the actual costs of their materials, services, and labor in the absence of a contract or in the case of a null contract, with no allowance for profit or overhead. **Boxwell,** 14 So. 2d at 632. See also **Villars v. Edwards,** 412 So. 2d 122, 125 (La. App. 1st Cir.), writ denied, 415 So. 2d 945 (La. 1982).

Following **Boxwell,** the case most cited by the courts of this state for this unlicensed contractor recovery "rule" is the Third Circuit's case, **Hagberg v. John Bailey Contractor,** 435 So. 2d 580, 586 (La. App. 3rd Cir. 1983), writs denied, 444 So. 2d 1245, 1245 (La. 1984). In **Hagberg,** a subcontractor (J.R. Hagberg, d/b/a

---

[20] The law of quasi-contracts in Louisiana is mired in confusion, with courts using the terms unjust enrichment, *actio de in rem verso,* and *quantum meruit* (the Louisiana civilian version, the common law version, and the morphed Louisiana civilian/common law version) interchangeably; however, these recovery theories are separate and distinct. Furthermore, the Legislature codified the theory of unjust enrichment by adopting the five elements of the civilian *actio de in rem verso* in enacting Article 2298 (1995 La. Acts No. 1041, § 1 (eff. Jan. 1, 1996)). See Jeffrey L. Oakes, "Article 2298, the Codification of the Principle Forbidding Unjust Enrichment, and the Elimination of Quantum Meruit as a Basis for Recovery in Louisiana," 56 LA. L. REV. 873 (1996).

Jim Jackson Contractors) sought payment for work it did in connection with resurfacing streets in Lake Arthur, Louisiana. **Hagberg**, 435 So. 2d at 582. The general contractor (John Bailey Contractor and R.L. Abshire Construction, Inc.) refused to pay the subcontractor because it discovered that the subcontractor had failed to maintain its contractor's license and was not licensed at the time the road work was done. **Id.** at 582-83. However, at the time the parties entered into the agreement to upgrade the streets, the subcontractor was properly licensed to do the work. **Id.** at 582.

The **Hagberg** court recognized that a contract involving an unlicensed contractor was illegal, thus precluding enforcement. The court ruled that the subcontractor could not maintain his breach of contract claims. **Id.** at 584-85. However, the **Hagberg** court noted that the case did not involve a situation within the intended scope of protection of the Contractors Licensing Law. **Id.** at 586. The **Hagberg** court stated that because the Contractors Licensing Law was intended to protect against incompetence, inexperience, or fraudulence—and no such injuries were pled by the general contractor—the goals of the licensing statute were not implicated, so the subcontractor could recover its actual costs of materials, services, and labor under the theory of unjust enrichment. **Id.** at 587. After noting that the purpose of the Contractors Licensing Law "is [for] the protection of the general public 'against the incompetent, inexperienced, unlawful and fraudulent acts of contractors,'" the Third Circuit held that this case "does not present a situation of the type within the intended scope of protection of the licensing statute." **Id.** at 586. The Third Circuit further held that "[w]here incompetency or inexperience or fraudulence is not involved, the licensing statute can not be invoked to avoid payment of valid charges....Under these particular circumstances it would be unjust to allow [the general contractor] to benefit and escape liability for payment to [the sub-contractor]." **Id.**

In so holding, the Third Circuit found that the subcontractor met all five elements for a claim of unjust enrichment. **Id.** at 586-87 (citing **Minyard**, 205 So. 2d at 432). The **Hagberg** court cautioned, however, that its finding of the fourth element of unjust enrichment—an absence of justification or cause for the enrichment and impoverishment—required explanation:

> The crux of our consideration is that the licensing rules are not intended to permit the impoverishment-enrichment presented by the case at bar. For us to mechanically apply the general rule would result in inequity. **If Hagberg had fraudulently obtained the contract, if he had been inexperienced at the work he performed, or, if his work had been substandard, our decision would be otherwise; but such is not the case.**

(Emphasis added). **Id.** at 587. The **Hagberg** court further noted that under the facts of this case, the general contractor had a contractual obligation under the terms of the underlying construction contract to verify that its subcontractors were properly licensed. Therefore, the **Hagberg** court found that it would be "unconscionable" to allow the general contractor to avoid payment to the subcontractor, particularly when the general contractor did not raise the licensing issue until fifteen months after the subcontractor finished his work. **Id.**

The Third Circuit expounded upon its ruling in **Hagberg** in **Dennis Talbot Const. Co. v. Privat Gen. Contractors, Inc.**, 2010-1300 (La. App. 3rd Cir. 3/23/11), 60 So. 3d 102. In **Dennis Talbot**, the general contractor (Privat General Contractors) contracted with a subcontractor (Dennis Talbot Construction) to do site work and concrete work on the project (construction of St. Martin Bank and Trust in Lafayette). **Dennis Talbot**, 60 So. 3d at 103. The subcontractor submitted two proposals: to pour and form the building slab with all materials necessary to complete the job for $44,000.00; and to pour and form slabs for the parking lot and drive-thru columns and islands for $118,000.00. At the time the subcontractor submitted those proposals, it was not a licensed contractor and could

only perform jobs under $50,000.00. The subcontractor later became properly licensed two months after work began. **Id.**

The general contractor began receiving complaints from the subcontractor's materialmen that the subcontractor had not paid them. The general contractor also became concerned with the subcontractor's frequent absences from the project site. The general contractor requested that the subcontractor return to complete the project, advising that the general contractor was subject to a penalty of $500.00 per day for late completion. The general contractor also informed the subcontractor that even though it had received payments of $105,500.00 (less retainage of $5,750.00), it had failed to pay its materialmen's invoices totaling over $50,000.00. The general contractor ultimately paid the subcontractor's materialmen $57,502.43 to prevent liens and incurred an additional $28,700.00 to finish the subcontractor's work. **Id.**

The subcontractor later submitted an invoice to the general contractor for an outstanding balance in the amount of $31,407.08, which the general contractor did not pay. The subcontractor filed suit seeking the outstanding balance. The general contractor filed a reconventional demand seeking reimbursement for the payments it made to satisfy the subcontractor's materialmen and to complete the subcontractor's contract. **Id.**

Following trial, the trial court dismissed the subcontractor's claims and specifically found that the subcontractor and general contractor both took part in an illegal act, *i.e.*, the subcontractor's undertaking of a job in excess of $50,000.00 without a license. The trial court also denied the general contractor's reconventional demand, finding that the general contractor was barred from recovering against the subcontractor because as a general contractor, it had an affirmative duty to insure that its subcontractors were licensed. **Id.**

In deciding **Dennis Talbot**, the Third Circuit expounded upon its ruling in **Hagberg** and held that while the facts in **Dennis Talbot** were distinguishable from **Hagberg**, the **Hagberg** rationale still applied, but that in the **Dennis Talbot** matter, the **Hagberg** ruling prohibited recovery by the subcontractor. **Id.** at 104-05. Here, the Third Circuit noted that the subcontractor acknowledged having twenty-two years of experience as a contractor and of being familiar with the law requiring a contractor's license to perform jobs valued in excess of $50,000. **Id.** at 105. Despite that knowledge, the subcontractor entered into contracts totaling over $150,000 without a license. The subcontractor also signed a lien waiver with knowledge that one of its materialmen was owed $42,176.32. The **Dennis Talbot** court reasoned that "[t]he trial court may well have felt these two instances met the 'fraudulently obtained' contract exception this court spoke of in *Hagberg*." **Id.**

The **Dennis Talbot** court further held that "[t]he trial court reasonably could have found [the subcontractor] fell within the substandard work exception we also detailed in *Hagberg*." The Third Circuit noted that the trial court heard testimony regarding the work performed by the subcontractor: the subcontractor's work was substandard and not completed satisfactorily, and the subcontractor was rarely at the job site. The Third Circuit court further distinguished its prior ruling in **Hagberg**, noting that here, the subcontractor abandoned the job before it was fully completed, leaving the general contractor to complete the unfinished work at substantial cost. As opposed to the subcontractor in **Hagberg** who received no payment whatsoever for its work, the subcontractor in **Dennis Talbot** received the majority of its bid amount. **Id.**

For those reasons, the Third Circuit affirmed the trial court, holding that it was reasonable in finding that the **Dennis Talbot** subcontractor, unlike the subcontractor in **Hagberg**, was not entitled to recover his actual cost of materials, services, and labor under the theory of unjust enrichment based on the

"fraudulently obtained contract exception" and the "substandard work exception" the court previously outlined in **Hagberg**. **Id.**

Applying the **Hagberg** rationale to the case before this court, we find that this matter involves a situation within the intended scope of protection of the Contractors Licensing Law. In their reconventional demand, the Phillips *specifically pled* incompetence, inexperience, and fraudulence on the part of QRI, which implicates the goals within the intended scope of protection of the Contractors Licensing Law.

In **Hagberg** and **Dennis Talbot**, the Third Circuit held that if a contractor's actions fall into the "substandard work exception," it is not entitled to recover its actual cost of materials, services, and labor under the theory of unjust enrichment. Using this rationale in light of the findings by the Special Master and adopted by the trial court, it is clear that QRI defectively and sub-standardly constructed the addition to the Phillips' home.

Thus, like the subcontractor in **Dennis Talbot**, QRI's actions fall into the "substandard work exception" outlined by the court in **Hagberg**. This case represents the type of situation the Legislature sought to prevent by enacting the Contractors Licensing Law. QRI's actions fall into the "substandard work exception". Therefore, QRI is not entitled to claim the remedy of unjust enrichment. The Phillips may invoke the Contractors Licensing Law to prohibit recovery by QRI of its actual cost of materials, services, and labor under the theory of unjust enrichment.[21]

---

[21] The trial court agreed with the Special Master's finding that QRI's actions did not rise to the level of fraud pursuant to La. C.C. art. 1953. While we may well have decided the issue of fraud differently, we are bound by the manifest error standard of review. A reasonable factual basis exists in the record for the trial court's finding that QRI's actions were not fraudulent. Therefore, the trial court's finding was not clearly wrong. See **Marietta Tr.**, 225 So. 3d at 1147-48. Therefore, the Phillips are not entitled to an award of damages and attorney's fees under La. C.C. art. 1958.

We find that the trial court erred in granting QRI's demand and awarding QRI damages under the theory of unjust enrichment. Pursuant to **Hagberg** and **Dennis Talbot**, QRI's actions fall into the "substandard work exception." Because QRI's actions implicate the goals within the intended scope of protection of the Contractors Licensing Law, the Phillips may invoke that statute to prohibit recovery by QRI of its actual costs of materials, services, and labor under the theory of unjust enrichment.[22] We further find no error in the trial court's finding that the Phillips are not entitled to attorney's fees pursuant to La. C.C. art. 1958, which allows attorney's fees to be awarded when a contract is rescinded because of fraud pursuant to La. C.C. art. 1953.

## DAMAGES

On appeal, the Phillips argue that the trial court erred by failing to limit QRI's recovery to the contract amount pursuant to the "interest of justice language" contained in La. C.C. art. 2033.[23] Second, the Phillips argue that the trial court erred by failing to order the reimbursement of all of the payments the Phillips made to QRI under the null and void contract, in the amount of $210,780.66.[24] Finally, the Phillips argue that the trial court erred by failing to award them sufficient damages based upon the ample evidence presented during

---

[22] It is important that courts proceed carefully when resolving cases where unlicensed contractors have or receive actual knowledge that they are not properly licensed to contract or complete construction projects. The potential for abuse is great. If a contractor is not properly licensed, Louisiana law allows, under certain circumstances, recovery under La. C.C. art. 2298 for unjust enrichment costs. This nullifies the original contract and allows for recovery that may greatly exceed the bargained for contract price without notification to the owner. As in this case, the original contract price was $232,195.46. Then, the trial court found the contractor was entitled to "project costs" of $389,962.38, which is approximately 60% over the contract price. The equitable remedy of unjust enrichment should not support such a result. Where a contractor knows or receives knowledge of non-licensure, he should not contract or continue performing pursuant to the null contract, but, as dictated by La. C.C. art. 2033, "withdraw from the contract." Particularly troubling in this case is the testimony of Mr. Henderson, wherein he stated that in pricing the May 6, 2011 change order, he did not include any profit because he was aware that QRI did not have the required residential contractor's license and knew that QRI was not entitled to profits.

[23] See Phillips' Assignment of Error No. 2.

[24] See Phillips' Assignment of Error No. 6.

the trial before the Special Master.[25]  The standard of review applicable to an

award of special damages is the manifest error standard.  **Pinn v. Pennison**, 2016-

0614, 2016-0615 (La. App. 1st Cir. 12/22/18), 209 So. 3d 844, 849.

### *Louisiana Civil Code article 2033*

The Special Master found that QRI was entitled to recover under the theory

of unjust enrichment, or *quantum meruit*; however, the Special Master limited

QRI's recovery to the stated contract amount pursuant to the "interest of justice"

language contained in La. C.C. art. 2033.  The trial court disagreed with the

Special Master's finding in this regard, holding that QRI was entitled to recover

beyond the contract amount pursuant to the theory of unjust enrichment, or

*quantum meruit*.

Louisiana Civil Code article 2033 provides:

> An absolutely null contract, or a relatively null contract
> that has been declared null by the court, is deemed never
> to have existed. The parties must be restored to the
> situation that existed before the contract was made. If it is
> impossible or impracticable to make restoration in kind,
> it may be made through an award of damages.
>
> **Nevertheless, a performance rendered under a
> contract that is absolutely null because its object or its
> cause is illicit or immoral may not be recovered by a
> party who knew or should have known of the defect
> that makes the contract null.** The performance may be
> recovered, however, when that party invokes the nullity
> to withdraw from the contract before its purpose is
> achieved and also in exceptional situations when, in the
> discretion of the court, that recovery would further the
> interest of justice.
>
> Absolute nullity may be raised as a defense even by a
> party who, at the time the contract was made, knew or
> should have known of the defect that makes the contract
> null.

(Emphasis added).  Revision Comments--1984(c) to La. C.C. art. 2033 provides, in

pertinent part:

---

[25] See Phillips' Assignment of Error No. 5.

> Under this Article, a party who knew or should have
> known at the time of contracting of a defect that made the
> contract absolutely null may not avail himself of the
> nullity when the purpose of the illegal contract has been
> accomplished. See **Boatner v. Yarborough**, 12 La.Ann.
> 249 (1857); **Gravier's Curator v. Carraby's Executor**,
> 17 La. 118 (1841); **Mulhollan v. Voorhies**, 3 Mart.
> (N.S.) 46 (1824). This conclusion flows naturally from
> the principle expressed in the traditional Roman maxim,
> *nemo propriam turpitudinem allegare potest* (no one may
> invoke his own turpitude), sometimes called the "clean
> hands" doctrine.

Louisiana Civil Code article 1968 states that "[t]he cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy." To enforce the June 1, 2010 contract would produce a result prohibited by law, namely La. R.S. 37:2160(A) and La. R.S. 37:2167(A)—rules of public order requiring contractors to be properly licensed to contract and perform work. Thus, the cause of the June 1, 2010 contract is unlawful under La. C.C. art. 1968. Although the terms "illicit" and "immoral" are not defined in La. C.C. art. 2033, the term "illicit" is interchangeable with the term "unlawful."[26] As such, a plain reading of La. C.C. art. 2033 indicates that the provision barring recovery of a performance under an absolutely null and void contract applies to parties who knew or should have known of the defect that rendered the contract null. While Louisiana Law recognizes an unjust enrichment claim for an unlicensed contractor who knew of its improper licensure in certain instances, the party receiving the performance is also bound by the precepts of La. C.C. art. 2033, as explained by Revision Comments--1984(c), cited above.

### *Are the Phillips Entitled to Reimbursement of the $210,780.66?*

Pursuant to La. C.C. art. 2033, the Phillips are not entitled to reimbursement of the $210,780.66 they previously paid to QRI. As early as September 2010, the Phillips knew of the defect that rendered the contract null. It was September 2010

---

[26] Black's Law Dictionary defines "illicit" as "illegal" or "improper." BLACK'S LAW DICTIONARY (11th ed. 2019).

when Mr. Phillips first contacted the Board and spoke to Mr. Bourque, wherein he discovered that QRI did not possess the required residential building contractor's license. Nine months later, on July 29, 2011, the Phillips fired QRI from the project, indicating that they were dissatisfied with QRI's performance and intended to continue with the project on their own, at QRI's expense. In response, QRI requested a meeting with the Phillips to discuss continuing on as their contractor on the project and fixing the construction issues cited by the Phillips. QRI drafted an agreement to continue construction work on the project, dated August 1, 2011, which contained a provision that the Phillips would pay the outstanding ten percent retainer in the amount of $21,414.80, once all the problems with the construction were resolved. The Phillips refused to sign the agreement, arguing that it was unnecessary to do so when the June 1, 2010 contract already obligated them to pay QRI the ten percent retainer once the construction work on the project was completed. The Phillips eventually agreed, however, to allow QRI to continue their construction work on the project pursuant to the original contract despite being informed by the Board that QRI was not properly licensed to work as the residential building contractor on their project. Six months later, on January 6, 2012, the Phillips terminated their contract with QRI, citing that QRI's construction work was incomplete and listing five unresolved issues they claimed QRI refused to repair or resolve.

While not a contractor or a builder, the record shows that Mr. Phillips holds an undergraduate degree in aeronautical engineering and a master's degree in industrial hygiene and environmental science. While not a licensed professional engineer, Mr. Phillips is a certified industrial hygienist and a certified safety professional. The record demonstrates that Mr. Phillips was engaged in all aspects of the construction work performed by QRI on the project. During trial, Mr. Phillips affirmatively responded when asked whether he understood "the

31

obligations imposed by governments ... to license people in their respective spheres and/or occupations." Mr. Phillips was sophisticated enough to initiate contact with the Board in September 2010, when he and Mrs. Phillips suspected that QRI may not have been qualified to perform construction work on their project. Mr. Phillips admitted at trial that the Board told him on the September 2010 phone call that QRI did not possess the required residential building contractor's license. While the Phillips did eventually cancel the contract with QRI (*nine months later* on July 29, 2011), they hired QRI back and allowed it to continue construction work on the project under the June 1, 2010 contract. During the nine months between the Phillips' discovery that QRI lacked the proper license (September 2010) and their first cancellation of the contract (July 29, 2011), the Phillips complained about the quality of QRI's work on the project. However, the Phillips never followed up with the Board to determine whether QRI obtained the required residential building contractor's license, and allowed QRI to continue construction work on the project for six more months, until the Phillips ultimately terminated the contract with QRI on January 6, 2012.

We also note that the trial court held that Mr. Phillips interfered with QRI's construction work on the project. The record demonstrates that as the relationship between the Phillips deteriorated, the Phillips interfered with, delayed, and micro-managed QRI's construction work on the project. The Phillips refused to allow QRI's subcontractors to perform certain aspects of the project unless the Phillips were physically present onsite. The Phillips were also indecisive, and QRI had difficulty getting decisions from the Phillips on aspects of the project in a timely fashion. Despite operating under a fixed-fee contract, the Phillips also required QRI employees and subcontractors to price fixtures and other materials through Mr. Phillips' direct buy "discount houses," which caused QRI to expend additional administrative time on the project.

Mr. Henderson testified:

> A     Well, like I said, difficulty on their part making decisions regarding what they wanted incorporated into the house.  Plans were constantly being changed.  The work that we did was constantly being challenged, and in a lot of cases, we had to do things over again because [the Phillips] would not accept it.
>
> Mr. Phillips got real involved in directing my subcontractors ... and in doing so, messed up my scheduling and my ability to execute the project in a timely fashion.
>
> Q     Was he communicating with your subs through you?
>
> A     He was communicating with my subs directly, either through phone calls or emails or face-to-face.
>
> Q     And what about employees, was that happening with employees?
>
> A     Yes.  Some of my employees were approached and directed as well on numerous occasions, and were actually even hired by Mr. Phillips to do work on the [project] outside the scope that I was even unaware of.
>
> Q     He hired Q.R.I. employees to do work on the side?
>
> A     Yes, sir.
>
> Q     Did he present you with any of the requests to do those things as change orders?
>
> A     No.
>
> ***
>
> Q     ... Do you know if Mr. Phillips asked your subcontractors to have their prices re-bid through his buying club?
>
> A     ... He did ask me that....He had me reach out to them and have them go to particular vendors that were part of direct buy to try and get the materials they were going to use through direct buy and see if they can get a savings off of that.
>
> ***
>
> A     He was expecting me to -- if my sub, for example, came back and said, okay, you are going to save fifty dollars, I will knock fifty dollars off my bill, he would expect me to pass that on to him and knock fifty dollars off of that price.
>
> Q     Was that in the proposal anywhere?

**A** No, sir.

The record overwhelmingly supports the conclusion that Mr. Phillips knew or should have known of the defect that rendered the contract an absolute nullity. Furthermore, the evidence demonstrates that the Phillips interfered with, micro-managed, and delayed QRI's construction work on the project. Therefore, under La. C.C. art. 2033, the Phillips are not entitled to reimbursement of the $210,780.66 they previously paid to QRI. The Phillips received renovations and an addition to their home, albeit a defective one. The parish granted the Phillips an occupancy permit on April 25, 2011. The Phillips did receive some value for the sums they paid to QRI, and with the damages awarded herein, the Phillips should be made whole.

### *The Damages Award*

We conclude that the trial court erred in awarding QRI damages for its actual costs of materials, labor, and services under the theory of unjust enrichment. Pursuant to the application of the facts of this case to **Hagberg**, **Dennis Talbot**, and La. C.C. art. 2033, QRI is not entitled to recover unjust enrichment damages based on its substandard work. Further, QRI knew it was not properly licensed to perform the construction of the addition and the renovations pursuant to the June 1, 2010 contract based on written correspondence and telephone calls with the Board. Accordingly, we must reverse the portion of the trial court's April 30, 2018 judgment granting QRI's claims and awarding QRI damages in the amount of $179,181.72, a total of $141,876.72 (after adjustment).[27]

Louisiana Civil Code article 2762[28] imposes a duty upon contractors to construct a work that is suited for its intended purpose and to perform their work in

---

[27] As discussed in n.8 and n.10, *supra*, these amounts should be $39,479.00 and $139,702.72, respectively.

[28] Louisiana Civil Code article 2762 provides: "If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on

a good and workmanlike manner free from defects in materials and workmanship. **Hallar Enterprises, Inc. v. Hartman**, 583 So. 2d 883, 890 (La. App. 1st Cir. 1991). We find that the Phillips presented ample evidence that much of the work performed by QRI to renovate the Phillips' residence and build an addition thereto was defective, substandard, or incomplete. Because we hold that the trial court legally erred in applying the NHWA to the Phillips' claims, we reverse the portion of the trial court's April 30, 2018 judgment rejecting the Phillips' claim of $86,314.78 for remediation of the foundation.

We find that the Phillips are entitled to the following damages: $86,314.78 for pier and beam defects (foundation remediation); $9,500.00 for roof defects (replacement roof materials); $29,979.00 for the list of defective items/incomplete work ($31,959.00 minus $1,980.00 (representing the two items denied by the trial court)); and $28,689.79 for the expert witness fee (Robert Gregory), for a total of $154,483.57, plus legal interest from the date of judicial demand, February 15, 2012, until paid, as well as all court costs, including the costs of the Special Master.

**DECREE**

The portion of the trial court's April 30, 2018 judgment granting Quaternary Resource Investigations, LLC's claims and awarding it damages in the amount of $179,181.72, a total of $141,876.72 after adjustment, is hereby reversed.

The portion of the trial court's April 30, 2018 judgment granting the Phillips' reconventional demand is affirmed. We amend the trial court's damages awarded to the Phillips to the amount of $154,483.57, and assess all costs against Quaternary Resource Investigations, LLC, plus legal interest from the date of judicial demand, February 15, 2012, until paid, as well as all court costs, including

account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks."

35

the costs of the Special Master. The judgment is affirmed as amended. All costs

of this appeal are assessed to Quaternary Resource Investigations, LLC.

**REVERSED IN PART; AFFIRMED IN PART; AMENDED IN PART; AFFIRMED AS AMENDED.**

# STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## 2018 CA 1543

## QUATERNARY RESOURCE INVESTIGATIONS, LLC

## VERSUS

## RONALD DAVID PHILLIPS AND ANGELA PHILLIPS

************************************************

*P Mc by JEW*

**McClendon, J., concurring.**

I agree that the June 1, 2010 contract is an absolute nullity; that the NHWA does not apply; and that the trial court did not manifestly err in declining to find QRI perpetuated fraud on the Phillips and award the Phillips attorney's fees. However, with regard to damages, based on the exceptional circumstances presented, and in the interest of justice, I concur in the result reached. See LSA-C.C. art. 2033.

QUATERNARY RESOURCE
INVESTIGATIONS, LLC

VERSUS

RONALD DAVID PHILLIPS
AND ANGELA PHILLIPS

FIRST CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

NO. 2018 CA 1543

WRC by JGW

CHUTZ, J., concurring in part and dissenting in part.

I respectfully disagree with the portion of the majority opinion finding the substandard work exception applicable in this case. In rendering judgment, the trial court adopted the finding of the special master that "[w]hile there are serious deficiencies in the work of QRI, ... the actions of QRI [did not rise] to the level of fraud, incompetence or inexperience necessary to defeat a claim of *quantum meruit*." In my opinion, this factual finding, which cannot be reversed in the absence of manifest error, precludes the application of the substandard work exception. While I might have reached a different factual conclusion had I been sitting as the trial judge, I do not believe the record supports a finding of manifest error in the trial court's finding. Accordingly, I dissent from the portion of the majority opinion reversing the trial court's award to QRI to the extent of the actual cost it incurred for materials, services, and labor. See *Alonzo v. Chifici*, 526 So.2d 237, 243 (La. App. 5th Cir.), writ denied, 527 So.2d 307 (La. 1988); *Hagberg v. John Bailey Contractor*, 435 So.2d 580, 586-87 (La. App. 3d Cir. 1983), writs denied, 444 So.2d 1245. In all other respects, I concur with the majority opinion.

WIL *by* JEW

**LANIER, J., concurring in part, and dissenting in part.**

I agree with the majority that the June 1, 2010 contract between the Phillips and QRI is an absolute nullity. There is no dispute in the record that QRI was never properly licensed for residential contract work over $75,000.00 while it performed the work on the Phillips' contract. Louisiana Civil Code article 2030 states, in pertinent part: "A contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral." While performance on the contract without a proper license was in violation of a rule of public order, i.e. La. R.S. 37:2167(A), the object of the contract, an addition to the Phillips' home, was not illicit or immoral.

Both the special master and the trial court found the contract to be void *ab initio*. I agree that the contract is void because it was executed in violation of La. R.S. 37:2167(A), a rule of public order requiring residential building contractors to be licensed. See *Hagberg*, 435 So.2d at 584-85. Absolute nullity may be invoked by any person or may be declared by the court on its own initiative. La. C.C. art. 2030; *Alco Collections, Inc. v. Poirier*, 95-2582 (La. App. 1 Cir. 9/27/96), 680 So.2d 735, 743, writ denied, 96-2628 (La. 12/13/96), 692 So.2d 1067. The Phillips invoked the absolute nullity of the contract in their reconventional demand.

A contract is null when the requirements for its formation have not been met. La. C.C. art. 2029. Since the contract is absolutely null, it is deemed never to have existed, and the parties must be restored to the situation that existed before the contract was made. La. C.C. art. 2033. What logically follows from this is that the NHWA could not apply to the instant case, as no rights can flow to either party from a null and void contract. See *Williams v. Enmon*, 380 So.2d 144, 146 (La. App. 1 Cir. 1979), writ denied, 383 So.2d 12 (La. 1980). As such, I agree with the majority opinion that the trial court erred in not awarding the cost of the foundation repairs to the Phillips due to lack of notice as required by the NHWA.

1

However, I depart from the majority opinion on the issue of the remedy; specifically, whether QRI can recover its actual costs from its work on the Phillips' addition to their home. The penalties of La. R.S. 37:2167(A) must be enforced against any contractor who attempts to do work without a proper license. In the instant case, QRI was sanctioned for its unlawful actions according to the law. The majority opinion essentially functions as a second punishment against QRI for violating La. R.S. 37:2167(A). The majority's position could also create precedent for an inequitable situation where an owner or general contractor, dissatisfied with an unlicensed contractor's work, alleges the work is "substandard," despite receiving the benefit of substantial completion of the work, thereby preventing the unlicensed contractor from recovering any costs it incurred in the course of completing that work. Such a result could financially ruin a contractor, as many contractors function as a "one man business." I find the intent of the licensing statute is to punish and deter unlicensed contractor work, but not to potentially send a contractor into financial ruin.

The majority relies heavily upon two cases from the Third Circuit: *Hagberg* and *Dennis Talbot*. While I find the principles of *Hagberg* to be guiding in the instant case, I find *Dennis Talbot* to be distinguishable from the instant case.

The majority uses the "substandard work exception" fashioned by the Third Circuit as justification for disallowing any recovery whatsoever by QRI. This exception appears to have been created by *Dennis Talbot* based on dicta found in *Hagberg*; however, *Hagberg* does not explicitly create this doctrine. *Hagberg* does nothing more than suppose, given the facts of that case, that had Hagberg been found fraudulent in obtaining the contract, or had been proven to be inexperienced at the work he performed, or if his work had been substandard, then enrichment without cause would have been an improper remedy. *Hagberg* at 587.

2

This supposition in *Hagberg* is dicta from which the *Dennis Talbot* court fashioned the "substandard work exception."

While I am reluctant to apply the "substandard work exception" to the instant case, I am equally hesitant to classify QRI's work as substandard. Clearly, the Phillips were not satisfied with QRI's slow progress and poor workmanship. The majority states that the Phillips interfered with QRI's work on the project. Specifically, the majority notes how the Phillips blocked subcontractors from performing their work unless the Phillips were present, how the Phillips could not provide clear decisions on certain aspects of the work, and how the Phillips micro-managed pricing fixtures and materials, resulting in unnecessary delays. I therefore find that QRI's "substandard" portion of work is partially the doing of the Phillips, unlike the factual situations in *Hagberg* and *Dennis Talbot*, where no such interference occurred.

While the majority points out that the Phillips are educated and sophisticated individuals, they nevertheless are not contractors and are not experienced in the field of construction. One of the things the Phillips knew initially of QRI was that it was a "large corporation" that had "multimillion dollar projects" with the U.S. Army Corps of Engineers. The Phillips later discovered on their own that QRI was not properly licensed for residential work. Despite this discovery, the Phillips continued with the contract for at least seven months .

The Phillips seemed to be first aware of the licensing issue around September 15, 2010, when Mr. Phillips first inquired as to whether QRI was properly licensed to work on his project. Mr. Henderson reassured Mr. Phillips that QRI had proper licensing. After making an inquiry with the Licensing Board, Mr. Phillips received a copy of QRI's application for a Residential Building Contractor's License, dated October 8, 2010, four months subsequent to the contract date when Mr. Henderson first assured the Phillips that QRI was properly

3

licensed. Mr. Phillips had knowledge that QRI began the project without the proper license; however, the Phillips did not threaten to terminate the contract until July 29, 2011, and did not dismiss QRI until January 6, 2012.

In contrast, *Dennis Talbot* presents a different scenario where a subcontractor effectively abandoned the project, leaving the general contractor to complete the work. QRI did not abandon its work; rather, it attempted to renegotiate the contract after the Phillips threatened to terminate. Further, in *Dennis Talbot* it was found that both the contractor and subcontractor colluded in the illegal undertaking of a job without proper licensure. There is no such finding in the instant case, and the Phillips did not have an affirmative duty to insure that QRI was licensed.

Being guided by *Hagberg* and not by *Dennis Talbot*, I find no basis for the "substandard work exception," and instead find that there is a basis for QRI to recover its actual costs through the theory of enrichment without cause. As the majority noted, both the special master and the trial court did not make a finding of fraud. Also, the actions of the Phillips exacerbated QRI's failure to adequately complete the work. Thus, there is a contract that is void *ab initio*, a contractor who has done extensive but partially inadequate work for a homeowner, and a homeowner who has paid a contractor for the work.

Although I find, as the majority notes, that the trial court was not manifestly erroneous in not finding fraud in the instant case, I find that the trial court was manifestly erroneous in not finding the existence of error. Error vitiates consent only when it concerns a cause with which the obligation would not have been incurred and that cause was known or should have been known to the other party. La. C.C. art. 1949.

At their first meeting in 2007, Mr. Henderson told the Phillips that he could not work on their project because he did not possess the proper license for

4

residential construction contracts that exceeded $75,000.00. Because of this information, the Phillips did not execute a contract with Mr. Henderson. At their second meeting, Mr. Henderson told the Phillips that he was employed with QRI, which had the necessary residential construction licensing to build the addition to their home. The Phillips then executed the residential construction contract with QRI for the addition to their home on June 1, 2010.

Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation. La. C.C. art. 1950. A contract may be invalidated for unilateral error as to a fact which was a principal cause for making the contract, but only when the other party knew or should have known that it was a principal cause. *Degravelles v. Hampton*, 94-0819 (La. App. 1 Cir. 3/3/95), 652 So.2d 647, 649, writ denied, 95-0826 (La. 5/5/95), 654 So.2d 332. In the instant case, the misrepresentation of whether QRI was properly licensed is an error concerning the cause of the contract, which bears on the qualities of QRI. It was not until Mr. Henderson told the Phillips that QRI was properly licensed that the Phillips agreed to execute the contract.

Error can vitiate consent, so that a contract may be rescinded based on error. *Angelo & Son, LLC v. Piazza*, 2008-0370 (La. App. 3 Cir. 12/10/08), 1 So.3d 705, 710, writ denied, 2009-0018 (La. 2/20/09), 1 So.3d 501. The Phillips were not aware of QRI's lack of a proper license until the inquiry with the Board by Mr. Phillips, which revealed that QRI had first applied for a Residential Building Contractor's License on October 8, 2010. QRI, which was in a much better position to be aware of its license status, told the Phillips on two separate occasions that it possessed the proper residential contractor license. The Phillips therefore

5

could not have known of the error at the time they executed the contract with QRI, on June 1, 2010. Therefore I find the contract between the Phillips and QRI must be rescinded as well as found void *ab initio*, and QRI is liable for all losses sustained by the Phillips that are attributable to the contract.

The Phillips' second assignment of error concerns the trial court's refusal to limit QRI's recovery to the contract amount, since the trial court found it was not necessary to uphold the terms of the contract pursuant to the "interest of justice" clause in La. C.C. art. 2033, which states, in pertinent part:

> [A] performance rendered under a contract that is absolutely null because its object or its cause is illicit or immoral may not be recovered by a party who knew or should have known of the defect that makes the contract null. The performance may be recovered, however, when that party invokes the nullity to withdraw from the contract before its purpose is achieved and also in exceptional situations when, in the discretion of the court, that recovery would further the interest of justice.

In its petition, QRI claimed it had completed its work under the contract and demanded from the Phillips the remaining 10% of the contract. Either by nullity or the vice of error, the contract cannot be enforced. QRI demands enforcement of the contract, but cannot do so since it either knew or should have known of the defect (lack of a proper residential contractor license) that made the contract an absolute nullity. Since QRI is not seeking withdrawal from the contract, the trial court was correct in its conclusion that the "interest of justice" clause does not apply.

An absolutely null contract is deemed never to have existed, and parties must be restored to the situation that existed before the contract was made. If it is impossible or impracticable to make restoration in kind, it may be made through an award of damages. La. C.C. art. 2033. Furthermore, *quantum meruit* is not available when a contract is illegal and unenforceable. See *Boxwell*, 14 So.2d at 631. While comment (b) of La. C.C. art. 2033 states that the restoration of the

6

parties to the situation that existed before the contract includes restoration of fruits and revenues, the rationale of *Boxwell* would prevent a recovery of total fruits or revenue because of an illegal, unenforceable contract.

The case *Howell v. Rhoades*, 547 So.2d 1087, 1089-90 (La. App. 1 Cir. 1989) illustrates this point. *Howell* states that the theory of *quantum meruit* protects restitution interests rather than reliance interests and can be limited to the amount the plaintiff actually lost by relying on an unenforceable contract, including reasonable profits. *Howell* goes on to say that where the contract is void, the measure of damages is the benefit conferred on the defendant, or "unjust enrichment," and the analysis of damages is made under *actio de in rem verso* principles.

Louisiana Civil Code article 2298 states:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.

> The amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, whichever is less.

> The extent of the enrichment or impoverishment is measured as of the time the suit is brought or, according to the circumstances, as of the time the judgment is rendered.

Comment (c) to the above article recognizes enrichment without cause, or *actio de in rem verso*, as a subsidiary remedy. The root principle of an unjust or unjustified enrichment, expressly recognized in Louisiana as a quasi-contractual action, is that the plaintiff suffers an economic detriment for which he should not be responsible, while the defendant receives and economic benefit for which he has not paid. The Louisiana Supreme Court set forth five prerequisites which must be satisfied to successfully invoke the action; there must be: (1) an enrichment, (2) an

7

impoverishment, (3) a connection between the enrichment and the impoverishment, (4) an absence of justification or cause for the enrichment and the impoverishment, and (5) no other remedy at law available to the impoverishee. *Scott v. Wesley*, 589 So.2d 26, 27 (La. App. 1 Cir. 1991), citing *Minyard*, 205 So.2d at 652; see also La. C.C. art. 2298.

Although the contract between QRI and the Phillips is void, QRI nevertheless built, albeit partially defective, an addition to the Phillips' home. This addition has a monetary value that is measurable. Both parties incurred impoverishments in the form of expenses. QRI received enrichment in the form of payment by the Phillips, and the Phillips received enrichment in the form of an addition to their home. These enrichments and impoverishments must be balanced against one another.

The assessment of the appropriate amount of damages by a trial judge or jury is a determination of fact, one entitled to great deference on review. The manifest error standard of review applies when an appellate court examines a fact finder's award for a party's actual loss, because such damages must be proven with reasonable certainty. See *Howard v. United Services Auto. Ass'n*, 2014-1429 (La. App. 1 Cir. 7/22/15), 180 So.3d 384, 394, writ denied, 2015-1595 (La. 10/30/15), 179 So.3d 615. The trial court adopted most of the special master's findings regarding the value of items in need of remediation. Based on the record and evidence, I do not find the trial court to be manifestly erroneous in making those assessments of value. See *Stobart*, 617 So.2d at 882.

The trial court found that, without any mark up for profit or overhead, QRI expended "actual hard costs" totaling $389,962.38. (R. 376-81, Ex. QRI2, Trial court judgment, p. 5) Due to the illegal nature of the contract, QRI is not entitled to an allowance for profit and overhead, but only the actual cost of labor, services, and materials. See *Boxwell*, 14 So.2d at 632; See also *Alonzo v. Chifici*, 526 So.2d

8

237, 243 (La. App. 5 Cir. 1988), writ denied, 527 So.2d 307 (La. 1988). However, QRI includes "overhead" in the amount of $31,959.12 as one of its expenses. I find the trial court was manifestly erroneous to include the overhead in QRI's actual costs, and would amend that award by deducting the overhead cost. QRI also includes their general and administrative (G&A) expenses as $36,900.86, and subcontractor G&A expenses as $2,514.69. G&A expenses include salaries of a contractor's personnel above superintendent not directly assigned to the work. See Lee v. Allied Chemical Corp., 331 So.2d 608, 609 (La. App. 1 Cir. 1976), writ denied, 337 So.2d 525 (La. 1976). QRI is not entitled to recovery of G&A expenses, and I would likewise amend the award by deducting these costs. This leaves QRI with $318,587.71 of recoverable expenses.

The Phillips have paid QRI $192,733.24 on the contract price (the total contract price less the 10% retainage), and an additional $18,047.39 for the one change order, bringing their total payments to $210,780.66.[1] After subtracting the Phillips' total payment from QRI's total recoverable expenses, QRI has remaining recoverable expenses of $107,807.05.

The majority correctly calculated the Phillips' losses at $154,483.57. However, QRI is entitled to its own losses of $107,807.05 for the actual costs of its work under the theory of enrichment without cause. After balancing these two losses, the resulting recovery for the Phillips is $46,676.52. I therefore join the majority in all other respects, other than the remedy, and would render an award to QRI, which would offset the award to the Phillips, leaving a resultant award to the Phillips of $46,676.52.

---

[1] We note that simply adding $18,047.39 to $192,733.24 equals $210,780.63; however, when first subtracting the 10% retainage ($21,414.80) from the total contract price ($214,148.07), then adding the price of the change order, ($18,047.39), the result is $210,780.66, which was the finding of the trial court.